**WELLS FARGO & COMPANY, a corporation, and Baker Industries, Inc., a corporation, Plaintiffs,**

v.

**WELLS FARGO EXPRESS COMPANY, a Nevada corporation, Defendant,**

**Wells Fargo Express Company, A. G., a Lichtenstein corporation, Additional Defendant.**

Civ. No. LV–1496.

United States District Court, D. Nevada.

April 10, 1973.

Beckley, DeLanoy & Jemison, Las Vegas, Nev., Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Cal., Albert L. Ely, Jr., Cleveland, Ohio, for plaintiffs.

Wiener, Goldwater & Galatz, Las Vegas, Nev., Albert L. Jacobs, Jr., Jesse Reingold, New York City, for defendants.

## MEMORANDUM OPINION

### FACTS

ROGER D. FOLEY, Chief Judge.

Plaintiff Wells Fargo & Company, a California corporation (the Bank), is engaged in business in the United States and various foreign countries. The Bank uses registered trade names, trade-marks and service marks comprising in whole or in part the name "Wells Fargo". The Bank is involved in banking services, trust services, toy manufacturing, restaurant services and the travel agency business and has registered trade-marks to cover these services.

Plaintiff Baker Industries, Inc., a Delaware corporation (Baker), owns and has registered the "Wells Fargo" trademark for the armored car business, i. e., the transportation of money and valuables.

The defendant Wells Fargo Express Company is a Nevada corporation, incorporated September 1, 1961.

The complaint was filed on September 18, 1970, alleging that the defendant is infringing on the Bank's and Baker's trade-marks, all of which have been registered under the Lanham Act, 15 U.S.C. §§ 1051–1127. The plaintiffs also allege unfair competition. The plaintiffs allege that the defendant uses the name "Wells Fargo Express Co." in its American and foreign business activities and that the defendant has registered the plaintiffs' trade-mark and trade name in various foreign countries. Plaintiffs allege that the defendant has appropriated the trade-mark without their consent, that this use by the defendant confuses the public, that this use is likely to ultimately dilute their property rights in the registered trade-mark, that this use causes the plaintiffs irreparable harm and that the use unjustly enriches the defendant.

Both plaintiffs seek to enjoin the defendant from infringing their registered trade-marks and from using the words "Wells Fargo" in the United States or in foreign nations. Plaintiffs also seek an accounting for damages and profits, an order directing the destruction of labels, etc., in defendant's possession which bear the name "Wells Fargo", and costs.

The defendant's answer of May 20, 1971, alleges that it was a dormant corporation from its September 1, 1961, incorporation until 1968 and that it has never sold or offered for sale any goods or services. The defendant alleges that it changed its name from Wells Fargo Express Co. to Modern Research, Inc., on October 7, 1970, three weeks after

the complaint was filed, so the lawsuit is therefore moot. The defendant, as Modern Research, Inc., alleges that it always has been, and presently is, engaged only in the business of research and development (inventing), which activity is not covered by either plaintiff's trade-mark registration and which is not a part of either plaintiff's business. The defendant further contends that the plaintiffs' trade-mark is not very strong and has been weakened by the extensive use in commerce of the words "Wells Fargo" by several other companies and by the use of the words by both plaintiffs, which are unrelated companies. The defendant alleges that the scope of protection afforded such a weak mark is narrow, indeed. The defendant further alleges that the plaintiffs are without clean hands since this suit is brought as a misuse of judicial machinery in order to obtain discovery for use in foreign suits. The defendant's answer contains a counterclaim for treble damages under the United States antitrust laws and the Nevada civil conspiracy laws.

On December 22, 1971, the plaintiffs filed an amended complaint which alleged trade-mark infringement and unfair competition against the original Nevada defendant and the newly added additional defendant Wells Fargo Express Company, A. G., a Lichtenstein corporation. Service was made by mail to a foreign address, supposedly relying on Nevada's long-arm statute to confer jurisdiction. The newly added defendant has never made an appearance.

The following is a brief history of the Nevada defendant. The defendant was incorporated on September 1, 1961, by Mr. Wilkinson, Sr., now deceased. Mr. Wilkinson, Jr., is now the president of the defendant, Modern Research. Mr. Wilkinson, Sr., decided that he wished to name the corporation Wells Fargo Express Co. Mr. Wilkinson, Sr., was aware of the San Francisco Bank of the same name, but a check with the Secretary of State of Nevada revealed that the name Wells Fargo Express Co. was available as a corporate name in Nevada.

The defendant apparently remained dormant as a corporate shell until October 14, 1968, at which time the defendant opened a bank account. On this date the Nevada defendant corporation was apparently sold to the Lichtenstein corporation. The Lichtenstein corporation owned the Nevada defendant corporation until November 2, 1970, when the stock was purchased by Mr. Jacobs, the attorney for the defendant Modern Research. Apparently the defendant Modern Research is still owned by Mr. Jacobs.

On December 13, 1968, the defendant hired its first employee, Mr. Anthony Germano, who was hired to run an office and write checks. On January 1, 1969, offices were rented at 120 East Flamingo Road. On March 7, 1969, Ronald C. Davies, an inventor, was hired. On October 13, 1969, the assets of the defendant Wells Fargo Express Co. of Nevada were sold to Wilky Research and Development Corporation, a wholly owned subsidiary of Salem Electronics, Inc., a publicly owned and publicly traded company. Salem Electronics, a U. S. holding company which is now known as Salem Industries, is owned by the Lichtenstein corporation. So, on October 13, 1969, the assets of the Nevada corporate defendant were sold by the Lichtenstein corporation to a subsidiary of Salem Electronics, which is also owned by the Lichtenstein corporation. This just being a shuffle of ownership among subsidiaries, apparently the Lichtenstein corporation actually owned the defendant Nevada corporation until it was sold to Mr. Jacobs on November 2, 1970.

Before the Nevada defendant's assets were sold to Wilky Research and Development Corporation (owned by Salem) and after the sale the inventor, Mr. Davies, was busily working on various prototypes. On August 20, 1970, Baker advised the Nevada defendant by letter that the use of the words "Wells Fargo" constituted an infringement of registered trade-marks. On September 22, 1970, the Bank and Baker filed the original complaint charging the Nevada de-

fendant with trade-mark infringement and unfair competition. On October 7, 1970, the defendant Wells Fargo Express Co. of Nevada changed its name to Modern Research, Inc. On October 13, 1970, Wilky Research and Development Corporation defaulted on its note to Modern Research, so the assets (the prototypes and the employment contract of Mr. Davies) went back to the Nevada defendant. Modern Research paid Wilky Research $400 and simply acquired the assets, as well as the corporate shell, of Wilky, so that on October 13, 1970, Wilky Research was acquired by, and became a subsidiary of, Modern Research of Nevada, which was still owned by the Lichtenstein corporation. Then, on November 2, 1970, Modern Research and its subsidiary, Wilky Research, were purchased by Mr. Jacobs, the present owner of the stock.

The following facts are well substantiated in the discovery materials and are deemed admitted by the defendant Modern Research for the purposes of its summary judgment action which is before this Court. It is the position of the defendant Modern Research that even admitting all of these facts, it is entitled to summary judgment as a matter of law because of lack of jurisdiction and/or failure to state claims upon which relief can be granted.

The defendant had the name Wells Fargo Express Co. listed in the yellow pages of the Las Vegas telephone directory under the category "Research and Development". The defendant concedes the listing but does not concede the fact that this listing is advertising.

The defendant has stationery printed with its corporate name on it and used approximately twenty sheets.

The defendant leased an automobile under its corporate name.

At the Flamingo Road office of the defendant, the corporate name was on the door and on the building directory.

Ron Davies, the inventor, purchased electronic supplies.

The defendant had a checking account with the corporate name imprinted on the checks.

During the period between the hiring of Ron Davies and the sale of the assets of the defendant to Wilky (Salem), the plaintiffs allege that the defendant, through Mr. Davies, was developing various products to be sold through Salem. But the defendant disagrees and says the affidavits show that even before the formal sale of the defendant's assets to Wilky, the parties involved in the sale had already informally agreed to the sale and all persons concerned thought Mr. Davies was already working for Salem and his inventions would be owned by Salem and promoted by Salem. But the defendant is willing to concede that prior to the formal sale of its assets to Salem, the defendant was developing various products which were to be sold through Salem. But the defendant states that even admitting this fact for the summary judgment motion, the defendant should still succeed as a matter of law.

The plaintiffs also allege that the defendant's products were carried into other states to promote them and that the products were shown to various people in Las Vegas in an attempt to sell them. Again, the defendant disputes this fact and claims that the products belonged to Salem and all persons involved believed that they belonged to Salem and not to the defendant. But the defendant is willing to concede for the purposes of his summary judgment that the defendant's products were carried into other states in a futile attempt to promote them and the products were shown to various individuals in Las Vegas. The defendant claims that these prototypes did not have the corporate name on them and that as a matter of law these circumstances do not constitute trade-mark infringement or unfair competition. (Defendant's factual concessions, summary judgment oral argument, Tr. June 8, 1972, pp. 54, 57, 58.)

Plaintiffs allege that the defendant negotiated for the purchase of real es-

tate on the Las Vegas Strip in anticipation of building a resort hotel. The affidavits of the plaintiffs (Heath Dep. Tr. 5–6) and the defendant (Marcus Dep. Tr. 64–65) are directly contradictory with regard to whether the negotiations were in the name of Wells Fargo or in the name of Salem. But, for the purpose of the summary judgment motion, the defendant concedes that the negotiations to purchase the real estate were in the name Wells Fargo, and the defendant again argues that as a matter of law there was no trade-mark infringement or unfair competition.

## JURISDICTION

There are two jurisdictional aspects which will be dealt with separately. First is the jurisdictional question of whether the United States trade-mark and unfair competition laws are to be given extraterritorial application. The second jurisdictional question deals with the domestic trade-mark infringement and unfair competition allegations.

Also, aside from reliance on 28 U.S.C. § 1338, which confers jurisdiction on the Federal District Courts for Lanham Act proceedings, the plaintiffs have also relied on 28 U.S.C. § 1332, which requires diversity and the jurisdictional amount.

### A.

*Jurisdiction over Foreign Activities— Lanham Act*

■ The plaintiffs have amassed numerous documents which show various foreign-based organizations using the name Wells Fargo for different activities throughout the world. The position of the plaintiffs appears to be that the use of the name Wells Fargo by numerous foreign organizations is causing the plaintiffs grave injury to their worldwide good will and will prevent the plaintiffs from expanding into international markets. The plaintiffs have registered trade-marks in the United States and do not approve of the foreign use of "their" trade-mark. Therefore, the plaintiffs seek to enjoin the defendant

from using the name Wells Fargo in any foreign country and seek to have the existing foreign registrations allegedly belonging to the defendant removed as a violation of the Lanham Act. The plaintiffs' position is logical only if the Lanham Act of the United States is given world-wide effect. The plaintiffs can complain about the international injury to "their" good will only if their right in the Wells Fargo name is also international. That is hardly the posture of the law. Registration in the United States gives protection in the United States; if the plaintiffs seek international protection, they must register the mark in the foreign countries where the protection is needed.

■ The plaintiffs have shown that the Nevada defendant was owned by the Lichtenstein corporation. The plaintiffs have also alleged that the numerous organizations throughout the world which are using the name Wells Fargo are related in some way to the Lichtenstein corporation. Therefore, the plaintiffs reason, since the Nevada defendant is somehow remotely related to the foreign organizations using the name Wells Fargo in purely foreign activities, the Nevada defendant is liable for these foreign activities of the foreign relatives because the foreign relatives are infringing the plaintiffs' United States trade-mark. The plaintiffs have not explained how one domestic subsidiary could be responsible for the acts of other foreign subsidiaries, or even how the domestic subsidiary could be held responsible for the acts of the foreign parent corporation (Lichtenstein). A parent corporation may be liable for the acts of a subsidiary, but a subsidiary is not responsible for the acts of a parent, especially when the parent is a foreign parent and the acts being done by the foreign parent are legal in the foreign country where they are taking place.

■ But even if the plaintiffs could find a way to make the Nevada defendant liable for the acts of the numerous for-

eign organizations using the name Wells Fargo, the plaintiffs still would run into the problem of the extraterritorial application of the Lanham Act. If one were to assume arguendo that the Nevada defendant is the identical corporation that is making extensive foreign use of the name Wells Fargo, the Lanham Act would still not apply to the purely foreign activities of the defendant which are legal in those foreign countries. Under the above hypothesis, the plaintiffs would have personal jurisdiction over the defendant for the foreign activities, but that does not mean that the Lanham Act would apply to the foreign activities. Throughout the briefs the plaintiffs fail to distinguish between personal jurisdiction over a defendant who is engaging in foreign activities and the subject matter jurisdiction over those foreign activities. The plaintiffs have argued that because the Nevada defendant may be somehow related to the foreign activities by way of common parenthood from the Lichtenstein corporation, this Court therefore has personal jurisdiction over all of the foreign organizations and ipso facto has subject matter jurisdiction under the Lanham Act for all of the foreign activities. That is not the law.

There are several cases which explain why the Lanham Act would not apply to the foreign activities of the defendant even if, in fact, the foreign organizations could be linked to the defendant. At this point of the analysis, disregard the alleged domestic trade-mark violations, they are unrelated to the foreign activities. The concern is with the foreign activities which the plaintiffs attempt to hold the defendant responsible for and which are alleged to be in violation of the plaintiffs' United States trade-mark rights. Before discussing the cases, there are some general jurisdictional and conflicts principles which will make the decisions more easily understandable. As stated in Callmann Unfair Competition Trademarks and Monopolies, Third Edition (hereafter Callmann), Volume 4, page 865:

"Classically, the jurisdiction of each sovereign state is limited to its own boundaries. In the first instance, therefore, any challenge to the legality of an act will be determined by reference to the law of the sovereignty within which it was committed. It is an equally classical tradition that jurisdiction over the person can only be asserted if the defendant is subject to the judicial process of the sovereignty. Assuming personal jurisdiction, action normally lies for conduct which occurred in the sovereignty, although, in some instances, action will also lie for an act committed outside its boundaries, if the act would be illegal in both sovereignties or at least where it was effected.

"If the law of the place where the wrong was consummated, i. e., where it had its effect, recognizes no cause of action in tort, recovery should not be available in any other jurisdiction. If, on the other hand, a cause of action does lie at the place of the wrong, it should be recognized by the courts of other sovereignties—wherever jurisdiction can be obtained—even if the substantive law of the forum might be different. Thus, if the court has jurisdiction over the parties and the matter in controversy, it should apply the foreign law, unless, of course, such law is inherently offensive to the local public policy."

The three pertinent cases which deal with the question of whether a United States court may enjoin trade-mark infringement occurring in foreign countries are: Steele, et al. v. The Bulova Watch Co., Inc., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952); Vanity Fair Mills Inc. v. T. Eaton Co., Inc., 234 F.2d 633 (2d Cir. 1956), cert. den., 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Ramirez and Feraud Chili Co. v. Las Palmas Food Co., Inc., 146 F.Supp. 594 (D.C.S.D.Cal.1956), affirmed per curiam, 245 F.2d 874 (9 Cir.).

In the *Bulova* case, defendant Steele was an American citizen who registered the word "Bulova" as a trade-mark in

Mexico in his name. Defendant Steele imported watch cases and faces from the United States into Mexico and affixed the name "Bulova" to the watches he assembled in Mexico. While defendant's sales were restricted to Mexico, nevertheless purchasers of defendant's watches brought the watches into the United States and caused injury to the reputation of the plaintiff Bulova Watch Company when these watches were presented for repair under the warranty. The District Court granted a motion to dismiss, the Fifth Circuit reversed, and the Supreme Court affirmed the Fifth Circuit and held that the complaint stated a claim upon which relief could be granted. In reaching this decision, the Supreme Court relied on the facts that defendant Steele was an American citizen and therefore amenable to the powers of the United States even for acts committed abroad, and that acts committed abroad by this United States citizen had a substantial effect on the commerce in the United States. The question of defendant Steele operating under a valid Mexican trade-mark was rendered moot by the cancellation of the Mexican trade-mark by the Bulova Watch Company after the decision of the Fifth Circuit and before the decision of the Supreme Court.

The *Vanity Fair* case involved a suit brought in New York by a United States corporation that had registered the trade-mark "Vanity Fair" in the United States, and thereafter sought to enjoin a Canadian corporation from using in Canada the trade-mark "Vanity Fair". The Second Circuit affirmed the dismissal of the complaint by the District Court on the ground that the Court lacked jurisdiction as it related to the Canadian trade-mark. In an extensive discussion of the territoriality of trade-marks and conflict of law principles, the Second Circuit stated that trade-mark laws of one country have no extraterritorial effect, and that in actions for unfair competition the wrong occurs where the act of passing-off takes place.

In reviewing the Lanham Act to determine whether it should be given extraterritorial effect, the *Vanity Fair* court, interpreting *Bulova,* said it was quite obvious that "the rationale of the Court (in Bulova) was so thoroughly based on the power of the United States to govern 'the conduct of *its own citizens* . . . in foreign countries *when the rights of other nations or their nationals are not infringed',* that the absence of one of the above factors (that defendant was a foreigner and the legal owner of the mark in the foreign country) might well be determinative and that the absence of both is certainly fatal". 234 F.2d at 642. (Emphasis supplied.)

The plaintiff in *Vanity Fair,* just like the Bank and Baker in the instant case, also asserted that the International Convention for the protection of Industrial Property (Paris Union), 53 Stat. 1748 (1883, as revised 1934), provided for extraterritoriality of the trade-mark laws of each member nation. The Second Circuit concluded that "the Convention is not premised upon the idea that the trade-mark and related laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's law shall have only territorial application". 234 F.2d at 640.

The third case, *Ramirez,* which was decided after *Vanity Fair,* involved a fact situation quite similar to the *Bulova* case. The defendant was an American citizen and an American corporation which counterfeited plaintiff's labels in America and shipped the labels to Mexico where they were affixed to canned goods of inferior quality to that of plaintiff's. These canned goods bearing the defendant's counterfeited label were then transported into the United States, thereby harming plaintiff and causing a substantial effect on commerce in the United States. The Ninth Circuit on appeal affirmed the decision of the District Court granting plaintiff's motion for preliminary injunction. The Dis-

trict Court commented that the jurisdictional base in the *Ramirez* case was greater than was evident in the *Bulova* case, since in *Ramirez* the defendants were American citizens and an American company and they carried out infringement of the plaintiff's trade-mark in the United States by counterfeiting the labels in the United States. The *Vanity Fair* case is mentioned in the *Ramirez* decision, and the *Ramirez* court does not reject the statement of the law in the *Vanity Fair* case.

One commentator, Oliver, in 51 Am. Jur.Int'l.L. 380 (1957), studied the *Bulova* case and concluded that three factors must be present to justify the jurisdictional extension of that case: (1) Defendant's conduct must have had a substantial effect on United States commerce; (2) defendant must be a United States citizen, as the United States has broad power to regulate the conduct of its citizens in foreign countries; (3) there must be no conflict with trade-mark rights established under the foreign law.

Applying these principles to the present fact situation, the foreign activities of the foreign organizations are completely outside of the jurisdictional extension recognized as proper in the *Bulova* case. The plaintiffs have not shown (1) how the foregoing activities have a substantial effect on United States commerce; in fact, the plaintiffs allege that the injury is to their international good will. As discussed previously, the plaintiffs have not shown (2) that the foreign organizations and the Nevada defendant are in fact the same United States company, other than by the fact that the subsidiaries are of common parentage. Further, the plaintiffs have not shown (3) the requisite lack of conflict with trade-mark rights established under the foreign law; in fact, the plaintiffs admit that the foreign organizations have foreign trade-marks and seek to have this Court eradicate them.

It is obvious that even if the plaintiffs were able to establish the fact that the Nevada defendant is one and the same with the alleged foreign infringers, the Court would still lack subject matter jurisdiction under the Lanham Act because the purely foreign activities have no substantial effect on commerce in the United States and there would exist a conflict between the trade-mark laws of the United States and the trade-mark laws of the various foreign countries.

### B.

### *Jurisdiction over Foreign Activities—Diversity Jurisdiction*
### *28 U.S.C. § 1332*

■ The plaintiffs, aside from Lanham Act jurisdiction, rely also on diversity jurisdiction to create in this Court the power to resolve the foreign infringement dispute. The plaintiffs correctly submit that, even assuming that the acts complained of are purely foreign and do not affect commerce regulatable by Congress, this Court, in the exercise of its diversity jurisdiction, having personal jurisdiction of the defendant, would apply the doctrine of lex loci delecti. Trade-mark infringement and unfair competition are torts and the extent of this tort liability is governed by the law of the place where the alleged wrong was committed. Callmann, Vol. 4, Sec. 100.2(a)(2). Applying conventional conflict of laws rules, a personal action for such a tort may be brought in any place where the requisite service upon the defendant may be had. As stated in Ortman v. Stanray Corp., 371 F.2d 154 (7th Cir. 1967), "If, however, such a (patent) right is tortiously invaded in the territory where it is protected, a claim for damages on this ground may well be brought in a foreign court having jurisdiction over the defendant."

■ It is therefore clear that if the plaintiffs could prove that the Nevada defendant is one and the same with the foreign organizations, and since the plaintiffs have served the Nevada defendant and thereby created personal jur-

isdiction in this Court, the Court has the power to decide the foreign infringement questions. But that does not mean that this Court would apply the Lanham Act. As explained previously, the portions of the complaint dealing with purely foreign activities carried on by foreign organizations do not state a claim arising under the laws of the United States. The plaintiffs seem to intimate that the diversity jurisdiction, coupled with the personal jurisdiction, will result in the application of United States trade-mark and unfair competition law to the foreign activities. That is not the law.

▬▬▬ In a diversity action, the Court must apply the law of the State of Nevada, including its conflict-of-laws rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941). Nevada seems to follow the almost universal rule that the law governing a tort is the law of the place where the alleged wrong occurred, i. e., the law of the place where the passing-off occurred. In the instant case, the alleged foreign wrongs occurred in various foreign countries. Therefore, the law of the foreign countries would apply. Yet the plaintiffs have offered no foreign law and all of their arguments are applications of American law.

▬▬▬ In the *Vanity Fair* case, dealing with the Canadian and American registration of the trade-mark "Vanity Fair" by two different companies, the Court, after deciding that there was not a claim arising under the laws of the United States, dealt with the diversity of citizenship jurisdiction and held that the doctrine of forum non conveniens was properly relied on by the District Court to dismiss the entire complaint. The *Vanity Fair* court relied on the fact that there was a foreign forum where the plaintiff could bring its suit, the fact that the foreign forum was better able to understand the foreign law which was applicable and the court was doubtful of its power to enjoin acts committed in other countries. The same considerations would justify this Court in refusing diversity jurisdiction in the instant case, especially since the case is so complex and would involve the application of the laws of numerous foreign countries.

It should again be emphasized that diversity jurisdiction would exist only if the Court had personal jurisdiction over the foreign organizations. Again, this would require the plaintiffs to show that the Nevada defendant is one and the same with the foreign organizations and the plaintiffs have not satisfactorily shown this. It is true that the Lichtenstein defendant was added as an additional defendant and named in the amended complaint, but the Lichtenstein defendant has not made an appearance and the plaintiffs have not shown how Nevada's long-arm statute reaches this foreign organization. In any event, should the plaintiffs show the requisite personal jurisdiction over the foreign organizations, the Court should still refuse jurisdiction under the doctrine of forum non conveniens.

Therefore to summarize, as to the portion of the complaint pertaining to trade-mark infringement and unfair competition occurring in foreign countries, the Court should dismiss because the plaintiffs have failed to state a claim arising under the Lanham Act, thereby depriving the Court of subject matter jurisdiction, and the Court should hold that diversity of citizenship jurisdiction is lacking over the foreign organizations because of lack of personal jurisdiction, or if personal jurisdiction could be shown to exist over the foreign organizations because of the Court's personal jurisdiction over the Nevada defendant, the Court should refuse to exercise the diversity of citizenship jurisdiction by relying on the doctrine of forum non conveniens. Therefore the Court should grant the defendant's original motion to dismiss, for lack of subject matter jurisdiction, that portion of the complaint which pertains to the alleged infringement perpetrated by foreign organizations in foreign commerce.

## C.

*Jurisdiction over Domestic Activities—*
*Trade-Mark Infringement,*
*Lanham Act*

Are the defendant's domestic activities "in commerce" regulatable by Congress? A federal court has original jurisdiction under the Lanham Act, 15 U. S.C. §§ 1051–1127, for infringement of registered trade-marks if such infringement occurs "in commerce". Commerce for the purpose of the Lanham Act is defined in 15 U.S.C. § 1127 as meaning all commerce which may be lawfully regulated by Congress. The trade-mark infringement cause of action is created by the Lanham Act and the federal jurisdiction is also conferred by 28 U.S.C. § 1338(a) which states: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . trademarks . . ."

Putting aside the alleged foreign trade-mark infringement which was previously discussed, the discussion will now focus on the domestic activities of the Nevada defendant. Is the alleged infringement by the Nevada defendant "in commerce" regulatable by Congress so that the infringement is within the Lanham Act and within the jurisdiction of this Court? The plaintiffs take the position that the Nevada defendant's infringing activities substantially affect their interstate activities and therefore the infringement is within commerce regulatable by Congress. The defendant argues that the alleged infringement is purely intrastate and has no effect on interstate commerce so that this Court lacks jurisdiction under the Lanham Act.

A clear statement of the "in commerce" requirement is given in Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664 (2d Cir. 1968):

"It is true that prior to the enactment of the Lanham Act a federal remedy for trademark infringement would only lie if the infringing acts occurred in interstate commerce. See Dad's Root Beer Co. v. Doc's Beverages, Inc., 193 F.2d 77 (2d Cir. 1951); United States Printing & Lithograph Co. v. Griggs, Cooper & Co., 279 U.S. 156, 49 S.Ct. 267, 73 L.Ed. 650 (1929); Pure Oil Co. v. Puritan Oil Co., 127 F.2d 6 (2d Cir. 1942). However, by means of the Lanham Act the Congress sought to give trademarks nationally 'the greatest protection that can be given them,' S.Rep. 1333, 79th Cong., 2d Sess.1946, U.S.Code Cong. Serv.1946, p. 1277, and in order to effectuate that policy Section 45 of the Act, 15 U.S.C. Section 1127, significantly provides that the 'word commerce means all commerce which may lawfully be regulated by Congress.' The Supreme Court has liberally construed the 'broadened commerce provisions' of the Lanham Act and recognized their 'sweeping reach.' Steele v. Bulova Watch Co., 344 U.S. 280, 73 S. Ct. 252, 97 L.Ed. 252 (1952).

"It has long since been established that the Congress by virtue of its power to 'regulate Commerce * * * among the several States' may regulate purely intrastate commerce which exerts a substantial effect on interstate commerce. See, e. g., Katzenbach v. McClung, 379 U.S. 294, 85 S. Ct. 377, 13 L.Ed.2d 290 (1964). This interpretation has been widely followed in cases under the Lanham Act and federal subject matter jurisdiction has been upheld where an act of infringement though occurring in intrastate commerce has a substantial effect on interstate commerce. See Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792 (5th Cir.), cert. denied 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954); Iowa Farmers Union v. Farmers' Educational and Cooperative Union of America, 247 F.2d 809 (8th Cir. 1957); Lyon v. Quality Courts United, Inc., 249 F.2d 790 (6th Cir. 1957); Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87 (9th Cir. 1963), cert. denied 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964). A substantial effect on interstate com-

merce is present when the trademark owner's reputation and good will, built up by use of the mark in interstate commerce, are adversely affected by an intrastate infringement. See Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792 (5th Cir.), cert. denied 348 U.S. 888, 75 S.Ct. 208 [, 99 L.Ed. 697] (1954); Iowa Farmers Union v. Farmers' Educational and Co-operative Union of America, 247 F.2d 809 (8th Cir. 1957); Lyon v. Quality Courts United, Inc., 249 F.2d 790 (6th Cir. 1957). See also Robert, Commentary on the Lanham Act, 15 U.S.C.A., Substit. VII, c. 22, 268–269 (1948); Developments in the Law, Trade-Marks and Unfair Competition, 68 Harv.L. Rev. 814, 882–883 (1955)."

The Ninth Circuit has followed the same rationale in Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117 (9th Cir. 1968), cert. den., 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879, where the court squarely held that jurisdiction was present for the sale by the defendant of an alcoholic beverage solely in intrastate commerce which could affect the interstate sale and reputation of plaintiff's product and was therefore commerce which Congress could regulate. The court said, at 390 F.2d 120:

"Black & White Scotch is a scotch whisky manufactured abroad [and] . . . sold in interstate commerce and is concededly a scotch of excellent reputation. It is fairly obvious therefore that the infringement of this mark by another alcoholic beverage tends to jeopardize the good name of Black & White Scotch, or at least so diminish the appellees' ability to control and therefore sustain the excellent reputation of their scotch that it must have substantial effect on that trade-mark and its relation to interstate commerce."

The defendant relies on several Lanham Act cases in which the courts held that business essentially local in character is outside the scope of the word "commerce" as used in the Lanham Act.

In these cases the complaint was dismissed because the infringing use by the defendant was purely intrastate. The courts cautioned that the requirement that there be interstate commerce must not be taken lightly since it is jurisdictional in nature. The defendant relies heavily on Fairway Foods v. Fairway Markets, 227 F.2d 193 (9th Cir. 1955), which is a Ninth Circuit case which is older than the Black & White Scotch case. The plaintiff in Fairway Foods was a wholesale grocery concern and was the owner of a federal registration for the trade-mark "Fairway". The plaintiff supplied canned and packaged foodstuffs to over 1,250 "Fairway" stores in over one thousand cities and towns in many states, but not in California. The defendant operated a retail supermarket in Monterey Park, California, under the name "Fairway Market". The plaintiff sued the defendant for trade-mark infringement and unfair competition. The Ninth Circuit held that the Lanham Act did not extend to purely intrastate activities and hence affords no remedies for infringement of a federally registered trade-mark where the acts were carried out purely intrastate. The Court held that there was no likelihood of confusion between a midwest wholesaler and a grocer doing business only in a California city.

In the cases relied on by the defendant for the proposition that purely intrastate transactions cannot be within the Lanham Act, the trade-marks involved were not of national prominence. For instance, in the Fairway case, no person in California (very few persons, anyway) had ever heard of the Fairway wholesaler in the midwest. The cases, like Fairway, dealt with a trade-mark that had only local prominence, so that infringement in another area would not have any effect and therefore would certainly not have a substantial effect on interstate commerce. But in the Ninth Circuit Black & White Scotch case, the Court emphasized the national prominence and national good will of the

plaintiff in reaching the decision that the defendant's purely intrastate infringing activities had a substantial effect on the plaintiff's interstate business. The instant case is analogous to the Black & White Scotch case because the plaintiffs' "Wells Fargo" trade-mark is of national prominence. The defendant's Nevada activities may be purely intrastate in nature, but the infringement may substantially affect the plaintiffs' national reputation. The Wells Fargo name is well known throughout the United States. The Court could take judicial notice of the national notoriety of the historic name owned by the plaintiffs. As in the Black & White Scotch case, the unrestrained use of the name Wells Fargo by the defendant, if proven, may tend to jeopardize the good name of the plaintiffs and diminish the plaintiffs' ability to control their national reputation, thereby substantially affecting interstate commerce.

The plaintiff Bank has offices throughout Northern California and several branches in the Lake Tahoe area and is well known in Nevada. The plaintiff Baker operates an armored valuables transportation line from Colorado to various California cities and traverses Nevada on the route. It is evident that a dilution in the value of plaintiffs' trade-marks would have an effect on their interstate business and therefore substantially affect interstate commerce.

Also, it should be recalled that the defendant conceded for the purposes of the summary judgment motion (summary judgment transcript, oral argument, June 8, 1972, pp. 54, 57, 58) that the products of the defendant were carried into other states for the purpose of promoting them and various persons traveled to Nevada to view the inventions. This concession apparently takes the defendant's operations out of the purely intrastate category if the alleged promotion of the products is an infringing act.

Therefore, the defendant's alleged infringement, even if the activities were purely intrastate, are alleged to have a substantial effect on the interstate operations of the plaintiffs and hence the defendant's activities are within "commerce" for the purposes of the Lanham Act.

### D.

*Jurisdiction over Domestic Activities, Unfair Competition. Under Lanham Act, Pendent Jurisdiction, 28 U.S.C. § 1338(b), Diversity Jurisdiction, 28 U.S.C. § 1332.*

Thus far, in the discussion of the Nevada defendant's alleged infringing activities in the United States, the discussion has pertained solely to the plaintiffs' Lanham Act trade-mark infringement claim. Now the discussion will deal with the plaintiffs' unfair competition claims. The jurisdictional question dealing with the unfair competition claims is quite confusing and was difficult to discover because the Ninth Circuit is at variance with all other circuits and the parties to the suit failed to realize and discuss the jurisdictional problems involved.

Aside from 28 U.S.C. § 1338(a) which, in addition to the Lanham Act, confers jurisdiction for the infringement of registered trade-marks, the plaintiffs rely on 28 U.S.C. § 1338(b) which is a codification of the Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), pendent jurisdiction rule. 28 U.S.C. § 1338(b) states: "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the . . . trade-mark laws." Thus, in the instant case, should the Court decide that the plaintiffs have stated a substantial claim under the trade-mark infringement portions of the Lanham Act, the Court would have pendent jurisdiction over the related unfair competition claims under 28 U.S.C. § 1338(b). But should the Court decide that the plaintiffs have failed to state a claim for trade-mark infringement un-

der the Lanham Act, what happens to the unfair competition claims? The logical answer is that the Court would lack jurisdiction over the pendent unfair competition claims because there is nothing for it to be pendent to. In fact, that is the rule in all the circuits except the Ninth Circuit.

The Ninth Circuit's separation from the other circuits began with Stauffer v. Exley, 184 F.2d 962 (9th Cir. 1950), where the Court interpreted 28 U.S.C. § 1338(b) which had been newly added to 28 U.S.C. § 1338(a). The Court held that Section 1338(a) is a reaffirmation of the grant of jurisdiction in the Lanham Act and said "the purpose of § 1338(b) is to extend federal jurisdiction to the furthest possible extent". The Court held that the Lanham Act gives federal jurisdiction only in cases involving interstate unfair competition. "If the . . . unfair competition . . . is purely local and did not affect interstate commerce, we then have to look for federal jurisdiction in § 1338(b), or in diversity of citizenship". Thus, the Ninth Circuit decided that the Lanham Act created a federal unfair competition cause of action whenever interstate commerce was involved. So, even if there was no trade-mark infringement, if the unfair competition cause of action involves interstate commerce the Court would have jurisdiction under the Lanham Act and would apply a federal law of unfair competition. A district court in the Ninth Circuit could dismiss the suit only if the trade-mark infringement action failed to state a claim and the unfair competition action failed to state a claim or involved purely intrastate commerce.

The Ninth Circuit has wavered on the issue of whether the Lanham Act creates a federal cause of action for unfair competition, but the present law still seems to follow Stauffer v. Exley, as shown by the case of Volkswagenwerk Aktiengesellschaft v. Church, 256 F.Supp. 626 (D.C.S.D.Cal.1966), affirmed 411 F.2d 350 (9 Cir.):

"Apparently the law of the Ninth Circuit is that the Lanham Act, and specifically 15 U.S.C. § 1126(h) provides a federal cause of action for unfair competition generally (if such competition affects interstate commerce), and independent of any related claim under the copyright, patent or trademark laws; the cases of Stauffer v. Exley (9 Cir. 1950), 184 F.2d 962, and Pagliero v. Wallace China Co., (9 Cir. 1952), 198 F.2d 339, are to this effect, although this conflicts with the Second and Third Circuits: American Auto Association v. Spiegel (2 Cir. 1953), 205 F.2d 771, cert. denied 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391, and L'Aiglon Apparel v. Lana, Lobell (3 Cir. 1954), 214 F.2d 649.

"Two district court judges in California have declined to follow their court of appeals in the Stauffer and Pagliero cases, claiming that the statements in those cases are dicta. In the Ramirez case, in which the opinion of Judge Mathes was adopted in its entirety by the Court of Appeals for the Ninth Circuit, Judge Mathes says flatly:

' * * * no federal cause of action is given by the [Lanham] Act for unfair competition generally.' 146 F.Supp. 594 at 603.

That holding was followed in Panaview Door and Window Co. v. Van Ness (S.D.Cal.1954), 124 F.Supp. 329.

"But the latest Ninth Circuit cases ignore the Ramirez and Panaview cases, and reiterate the position taken in Stauffer and Pagliero: 'In holding that under the Lanham Act (15 U.S. C.A. § 1126) there had been created a substantive federal law of unfair competition wherever interstate commerce was involved, the Ninth Circuit differs from other circuits. Stauffer v. Exley, 9 Cir. 1950, 184 F.2d 962; Pagliero v. Wallace China Co., 9 Cir. 1952, 198 F.2d 339; * * * ' "

The law becomes even murkier when the focus is upon the question

of whether state or federal unfair competition law is applicable. Apparently, if the unfair competition claim involves interstate commerce so that the Court has jurisdiction under the Lanham Act without resorting to the pendent jurisdiction of Section 1338(b), a substantive federal law of unfair competition is applied. But if the unfair competition is purely intrastate so that it is pendent under Section 1338(b), then the state law of unfair competition is applicable. Callmann, Vol. 4, p. 365. But the morass thickens when the diversity of citizenship jurisdiction base becomes involved. Where diversity of citizenship exists, jurisdiction under Section 1338(b) adds nothing to, and fully coincides with, Section 1332, i. e., state unfair competition law would apply in either case. But what happens when the unfair competition claim is a federal claim under the Lanham Act because interstate commerce is involved and diversity of citizenship also exists? In a purely diversity case, state law would apply; in a purely federal unfair competition case, a federal law of unfair competition would apply. The resolution is found in the *Volkswagenwerk* case:

> "It seems fairly well settled in the Ninth Circuit that federal law should be applied to the issue of infringement of registered trademarks, but that state law should be applied to the claim of unfair competition, where diversity is one basis for jurisdiction. ' * * * the rule of Erie v. Tompkins [304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188] is applicable to the *unfair competition* issue raised under 1338(b) even though federal law is applicable to the "related claim under the copyright, patent or trademark laws." ' Kemart Corp. v. Printing Arts Research Lab., Inc. (9 Cir. 1959), 269 F.2d 375, 389; followed in Bliss v. Gotham Industries, Inc. (9 Cir. 1963), 316 F.2d 848, in which the court said, at page 853: (Emphasis supplied.)
> ' * * * Kemart being a diversity case, local law would apply regardless

of whether the claim for unfair competition was "appended (by virtue of 28 U.S.C.A. 1338(b)) to its claim arising under the patent laws" or stood alone in the complaint.'

"Kemart was also followed in Neal v. Thomas Organ Co. (9 Cir. 1963, 325 F.2d 978, 983–984.)"

Therefore, if diversity of citizenship exists, the state law of unfair competition applies regardless of whether the unfair competition claim is a federal claim or a pendent state claim. So, the issue of whether or nor diversity of citizenship exists will determine the law to be applied, assuming that there is a difference between the federal substantive law of unfair competition and the Nevada law of unfair competition.

The plaintiffs allege that diversity of citizenship under 28 U.S.C. § 1332 exists. If diversity jurisdiction exists, this Court would have jurisdiction over the unfair competition cause of action regardless of whether interstate commerce was involved. Plaintiff Bank is a California corporation which does business in California. Plaintiff Baker is a Delaware corporation with its principal place of business in New Jersey. The defendant is a Nevada corporation doing business in Nevada. Therefore, the requisite diversity exists if the jurisdictional amount can be met.

The plaintiffs have alleged that more than $10,000 is the amount in controversy. The appropriate measure is stated in Moore's Federal Practice, Vol. 1, p. 870: "Thus, in actions seeking to enjoin unfair competition the amount in controversy has been held to be the value of the right to be protected or the value to the complainant of the business or the good will to be protected". A typical application of the rule occurred in Indian Territory Oil & Gas Co. v. Indian Territory Illum. Co., 95 F.2d 711 (10th Cir. 1938), cert. den. 305 U.S. 607, 59 S. Ct. 67, 83 L.Ed. 386 (1938), where the Court held:

> "The test, in determining the amount in controversy in a case of this kind

presenting a continuing wrong to an established business growing out of unfair trade practices, is not the immediate pecuniary damages arising from the wrongful acts. It is the value of the business or the right to be protected; and business reputation or good will is an intangible asset to be taken into consideration in ascertaining the extent and value of the business or right."

Applying this rule to the instant case, it is clear that the plaintiffs' value in the historic name "Wells Fargo" far exceeds the $10,000 jurisdictional amount. Therefore, this Court has diversity jurisdiction over the unfair competition claim.

## E.

### *Summary of Jurisdiction over Domestic Activities*

Therefore, to summarize the jurisdictional issues with regard to the American activities of the Nevada defendant, this Court has jurisdiction under the Lanham Act and under 28 U.S.C. § 1338(a) for the trade-mark infringement claims because of either the interstate activities of the defendant or the defendant's intrastate activities and the resulting effect on interstate commerce. This Court has jurisdiction over the unfair competition claims because of either (1) the Ninth Circuit rule recognizing a federal unfair competition cause of action apparently under 15 U.S.C. §§ 1126(h) or 1121 whenever interstate commerce is involved; (2) 28 U.S.C. § 1338(b) which allows pendent jurisdiction because the intrastate unfair competition is related to the trade-mark infringement claim; (3) diversity of citizenship under 28 U.S.C. § 1332. Since this Court has diversity jurisdiction, the Nevada law of unfair competition will apply regardless of the jurisdictional basis for the federal unfair competition claim.

## F.

### *Trade-mark Infringemnt and Unfair Competition Claims in General*

Have the plaintiffs stated claims for relief of trade-mark infringement or unfair competition? The distinguishing characteristic of this area of the law is the confusion and lack of articulateness in explaining the numerous legal theories. The phrase "unfair competition" is a catchall used to identify various distinct concepts such as passing-off, dilution, confusion of goods, confusion of source, etc. To further confound the matter, it is often said that trade-mark infringement is just one part of the overall law of unfair competition. And conversely, it is said that the law of trade-mark infringement as it presently exists under the Lanham Act, is the same as common law unfair competition.

The confusion generated by the use of the single term "unfair competition" to identify several distinct causes of action is abundantly evident in the briefs filed in the instant case. When the plaintiffs speak of unfair competition, they are apparently talking about the causes of action correctly known as dilution and confusion of source. But when the defendant refers to unfair competition, the cause of action referred to seems to be passing-off or confusion of goods, a cause of action which requires direct competition between the parties. Both the plaintiffs and the defendant speak as though the unfair competition that they are respectively talking about is the only theory of unfair competition. The case law is not of much help. Often the courts use the term unfair competition to identify the cause of action before them and fail to clarify which theory of unfair competition is being dealt with. The result is an unwieldy assortment of case law and adequate authority for many contradictory propositions. Therefore, the plaintiffs and defendant have adequate authority for their differing interpretation of "unfair competi-

tion" or "trade-mark infringement". The task of this Court is to decide if the plaintiffs have stated a cause of action under any of the prevailing theories of unfair competition. One must be chary of the defendant's insistence that passing-off or confusion of goods is the only form of unfair competition. As will be seen, the defendant, in its motion for summary judgment, speaks only to the passing-off cause of action and completely disregards the other prevailing theories of unfair competition.

Before discussing the various theories of unfair competition, a few words about the distinction between trade-mark infringement and unfair competition. The term trade-mark infringement refers to a violation of the Lanham Act, specifically 15 U.S.C. § 1114. For trade-mark infringement to exist there must have been a validly registered federal trade-mark, trade name or service mark. A Section 1114 infringement basically covers the two theories known as confusion of goods and confusion of origin. The cause of action known as dilution is probably outside of Section 1114 trade-mark infringement and is therefore known as unfair competition. If a trade-mark is not registered, then the causes of action known as confusion of goods and confusion of source are a part of the law of unfair competition, rather than trademark infringement. Therefore, trademark infringement and unfair competition both cover the same acts and the same technical causes of action, but they are distinguished by the fact of whether or not the trade-mark is registered and therefore within Section 1114. To summarize and hopefully clarify, a cause of action for confusion of goods and a cause of action for confusion of source can be either trade-mark infringement or unfair competition, depending on whether the mark is registered; a cause of action for dilution is always a part of unfair competition. The above summary is a general rule and cases to the contrary can be found. The main point is that the various theories of unfair competition are the same, regardless of whether they are called trade-mark infringement or unfair competition, and the Court should not become bogged down by distinguishing between the different labels because there is ample authority for practically any view.

Callmann, Vol. 3, pp. 928 through 931, explains the various theories:

"Anomalous though it may seem, no act can be labeled a trademark infringement without more. Whether or not the court will recognize an infringement depends upon the scope of protection to which the trademark is entitled under common and statutory law, and this question is ultimately determined by the *singular* approach of the immediate tribunal. Therefore, the validity and nature of the mark for which protection is sought must be determined before the issue of infringement can be properly resolved. (Emphasis supplied.)

"An acid test of infringement could be distilled out of a formula which recognizes that the trademark serves three distinct and separate purposes: (1) It identifies the product and its origin, (2) it guarantees the product's unchanged quality, and (3) it advertises the product. Injury to the trademark in any of its offices as an identifying, guaranteeing or advertising device should suffice to constitute an infringement thereof. These three functions—of different importance at different times, in different lines of business and for different articles— are correlative. The classical trademark function, that of identification, has molded the development of the law of trademarks. The importance of the guarantee function has been somewhat overestimated, while the function of advertisement still awaits full recognition and an adequate place in the law.

"As set forth in greater detail in another chapter, a court may proceed upon any one of several acceptable premises in granting trademark protection. First, a trademark may be

protected because of the trademark statute under which it is registered. Second, a trademark may be protected on the theory of unfair competition if the plaintiff and the defendant are in fact competitors. Third, where the litigants are not in actual competition with each other, the court may grant protection on the theory of 'unfair dealing'. And, fourth, protection may always be predicated on the theory which recognizes the mark as property.

"Federal statutory protection is confined to the registered trademark; it protects the plaintiff against a defendant's use of his mark, or an imitation thereof, in interstate commerce if such use is likely to cause confusion or mistake or to deceive purchasers. The test of infringement in such cases is the likelihood of confusion. * * *

"Under the theory of unfair competition, any trademark or similar device adopted by the plaintiff, registered or not, will be protected against its use by a competitor in violation of the rules of fair competition if such use does injury to the plaintiff.

"The theory of unfair dealing would protect all trademarks against injury, even if attributable to a noncompetitor, if his conduct can be characterized as a breach of prevailing usages or ethical standards of fair dealing. This doctrine puts greater emphasis upon the so-called unfairness than upon competition. It tacitly assumes, of course, that certain rules of fair dealing are applicable to all, and it does not depend upon proof of a relationship between the disputants which justifies judicial intervention. By hypothesis, this approach has a general applicability; it is, for instance, always 'unfair' to conduct one's business in violation of the ordinary law of torts. * * *

"Under the fourth theory, which recognizes the trademark as a property right distinct unto itself, the interest of any plaintiff in his property could be accorded protection. * * *

"Although many decisions can be cited in support of each theory, the courts have not always drawn the lines precisely. Such terms as 'unfair competition' and 'confusion' have been bandied about in opinions involving neither competition nor confusion within the meaning of those terms under the Trade-Mark Act of 1905. Dilution might have been a more appropriate operative concept. Modern decisions do, however, evidence a trend which sparks a modest optimism that our courts will, in the future, do more justice to the nature of a trademark, even though there is little reason to anticipate any greater judicial willingness to accept theoretical exactitude."

The above material is a general statement of the entire area of unfair competition and/or trade-mark infringement. To avoid confusion, remember that whether a mark is protected under the Lanham Act for trade-mark infringement or whether it is protected without the Act under unfair competition depends only upon whether the mark was federally registered; the theory of protection could be the same under either.

The next quotation from Callmann, Vol. 3, pp. 538 through 548, pertains to trade-mark infringement under the Lanham Act. As will be seen, the Lanham Act protects against confusion of goods and confusion of business or source.

"It is the gravamen of an action for trademark infringement that the defendant's use of a trademark similar to the plaintiff's created a likelihood of confusion. The similarity of the trademarks is the potential source of such confusion and, in this context, exact similitude is not a sine qua non. Even trademarks that are not Siamese twins may, in general appearance or impression, be sufficiently similar to suggest a likelihood of confusion.

"Under the Act of 1905, two basic types of confusion were recognized:

Confusion of goods and confusion of businesses. The Lanham Act broadened the concept by jettisoning the premise that confusion could only arise out of the use of similar marks 'appropriated to merchandise of the same descriptive properties' or 'affixed to merchandise of substantially the same descriptive properties'. Absent this limitation, any kind of confusion, mistake or deception of the public arising out of the use of a trademark may give rise to a cause of action, and the Lanham Act's broader conceptual approach to confusion has rendered many decisions under the 1905 Act valueless as precedent. A likelihood of confusion attributable to the use of a similar trademark need no longer be predicated upon the claim that the public may be misled because there is a similarity between the goods or businesses. We may now refer not only to this 'relative' confusion, but also to a concept of absolute confusion, one that arises out of another's use of a similar mark in connection with a product or business wholly unrelated, or even alien, to that of the trademark owner. * * *

"There is a confusion of goods when an 'ordinarily prudent purchaser would be liable to purchase one product in the belief that he was purchasing the other.'

"Confusion of the sort which may be designated as confusion in the narrow sense is referable to the identity or origin of the product. The fact is that the mark which identifies the source of the goods need not bear the name of, or otherwise specify the seller; indeed, the purchasing public does not normally know the source of the article. It suffices that buyers will generally assume that articles bearing the same mark are from the same source and that the plaintiff can demonstrate 'that the public has become accustomed to regard its familiar wheat biscuit as emanating, if not from it by name, at least from a single, though anonymous, maker, and the second is as good for these purposes as the first * * *.

"If the public is deceived 'into believing that good will, or investment, of another, are enjoyed by or is a part of another's business, so that the ordinary public would be led to believe that, in dealing with such person, it was also dealing in some way with the other' there is a confusion of businesses. At this level it is clear that such confusion is referable to source and origin alone. Indeed, even though the products of the litigants differ in make, purpose or function, any impression generated by the use of a similar mark that the defendant's goods come from the plaintiff, or that the defendant's business is related to, or otherwise connected with, the plaintiff's, is misleading. Such confusion has also been characterized as 'confusion as to sponsorship'. * * *

"By whatever means it is achieved, the defendant should not be permitted to benefit by or trade upon any misleading suggestion, by trademark or other usage, of a relationship with the plaintiff's business or products. The plaintiff, as the owner of the infringed trademark is entitled to insist 'that its reputation shall be of its own making alone,' and that the quality of his product properly 'lies within his own control.' Although 'passing off' may be one result of any misleading usage, it is not the essence of the wrong. Diversion of trade may be the result of confusion, but even without it the injury may be as grievous. In such cases, the defendant user of the infringing trademark, may not only deprive the plaintiff of immediate trade but 'may indirectly do so by tarnishing his reputation, or it may prevent [the plaintiff] from extending his trade to the goods on which the infringer is using the mark.'"

After discussing confusion of goods and confusion of origin, Callmann asks whether the theory known as dilution is within the coverage of the Lanham Act.

He concludes that the theory of confusion of origin could be expanded to include dilution, but concedes that most courts consider dilution to be outside of the Lanham Act and therefore a part of the law of unfair competition. Callmann believes that legislation making dilution a cause of action under the Lanham Act is in order. Jurisdictionally speaking, the fact that dilution is not within the protection of the Lanham Act trade-mark infringement is significant because in most circuits dilution would have to be a pendent cause of action; if the plaintiff's only theory was dilution, the Court would have to find either pendent or diversity jurisdiction. But the Ninth Circuit, with a federal cause of action for unfair competition wherever the requisite interstate commerce exists, would presumably allow the Lanham Act to confer jurisdiction for a pure dilution cause of action.

To explain dilution, Callmann, at Vol. 3, pp. 953 through 955, states:

"Although confusion of goods or businesses is the more usual and most immediate consequence of trademark infringement, it is not the only by-product of the wrong. The attrition of a trademark's value may be the eventual outcome of infringements that involve no such confusion. It is, therefore, incorrect to equate trademark infringement with passing off, or to conclude that the only index of such infringement is whether or not the purchaser would be induced to purchase the defendant's product instead of the plaintiff's; this has reference to confusion of goods only, and does not cover all possible cases. Even the oft-cited but long-slighted aphorism that the law of trademarks is 'only a part of the broader field of unfair competition' has rather limited validity. Though it is true that one well-spring of the law of trademarks is the competitive relationship, it should be remembered that there may well be noncompetitive violations of trademark rights, and that, in all such cases, logic should dictate exceptions to the rule.

"Noncompetitive trademark infringements occur in two different contexts. The one discussed above involves noncompeting goods which are nonetheless so kindred that the maker or sponsor of one might naturally be assumed to be the maker or sponsor of the other. That might mean that the industrial or commercial picture reasonably suggests the possible future expansion of the plaintiff's business so as to include the article in question. The confusion evident in such a case is confusion of businesses.

"The other type of noncompetitive trademark infringement involves noncompeting goods which are so completely unrelated that there can be no likelihood or prospect of confusion at all. In this context, however, the defendant's continued use of an identical or similar trademark will inevitably dilute the distinctiveness of the plaintiff's mark. The gravamen of a dilution complaint is that the continuing use of a mark similar to the plaintiff's will inexorably have an adverse effect upon the value of the plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness. Dilution is an act which 'threatens two separable but related components of advertising value. Junior uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey.' This injury differs materially from that arising out of orthodox confusion; if the similarity between the marks in question provokes confusion, the result thereof is an immediate or imminent loss of sales, because the confusion tends to divert potential patronage from the plaintiff to the defendant. Such confusion creates an immediate injury, while dilution is a cancer which, if allowed to spread, will inevitably destroy the advertising value of the mark.

\* \* \* \* \* \*

"It appears that the courts have been influenced, consciously or other-

wise, by the fact that the defendant is attempting to appropriate values which are properly the plaintiff's that such invasion of the plaintiff's rights may prove disastrous, and that the plaintiff is deserving of relief. On the other hand, the paralyzing autocracy of the doctrine of passing off, which has stunted the natural development of a healthy law of unfair competition, still holds sway. Thus, we sometimes read opinions which pay lip service to 'orthodoxy,' but covertly adopt the result that would obtain if the 'heresy' of dilution were accepted. The holdings, dictated by the equities involved, are sound but the reasoning analytically fails to explain why the relief sought was granted.

"It is abundantly clear that the latent danger of dilution exists where marks have been widely popularized. In such cases, the court should not be reluctant to grant relief, and should not embark upon an obviously irrelevant inquiry into the possibility of confusion. Any use of such famous marks as 'Aunt Jemima,' 'Beefeater,' 'Budweiser,' 'A. & P.,' 'RCA' or 'WOR,' 'Life,' 'Martha Washington,' 'Greyhound,' for products or services other than the original should be enjoined, whether or not there is any similarity between the goods."

*Callmann* recognizes a fourth theory of protection which recognizes the trade-mark as a property right distinct unto itself. But this fourth theory affords no protection different from the other three (confusion of goods; confusion of origin; dilution) and seems to be often intertwined with the confusion of origin and dilution theories as a rationale, rather than as a distinct theory. At any rate, the property concept for protection is not very popular in the case law.

In the instant case, since the plaintiffs have a federally registered trade-mark, the Court must look to see if they have stated a claim for confusion of goods and/or confusion of origin under Section 1114 of the Lanham Act and whether they have stated a claim for dilution under the law of unfair competition. First, a look at the cases in the Ninth Circuit to determine the treatment afforded the different theories of protection.

As previously mentioned, the courts have been far from precise in their discussions of trade-mark infringement and unfair competition. In the Ninth Circuit cases which follow, the courts, in discussing trade-mark infringement under the Lanham Act, apply the likelihood of confusion test of infringement but often fail to distinguish between confusion of goods and confusion of origin. The trial court views the facts and decides whether or not there is a likelihood of confusion; sometimes the courts seem to be referring to likelihood of confusion of goods and sometimes to likelihood of confusion of source, and sometimes both. Although the confusion of goods and confusion of origin theories seem to have been blurred, the dilution theory remains distinct and will be discussed later.

Section 32 of the Lanham Act, 15 U. S.C. § 1114, provides in part:

"(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

\* \* \* \* \* \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided . . . ."

■ A cause of action for trademark infringement exists, assuming the requisite jurisdiction and connection with commerce are established, where an individual uses a trade-mark (1) without consent; (2) in connection with the sale, offering for sale, distribution, or advertising of any goods or services;

(3) where such use is likely to cause confusion or to deceive purchasers as to the source or origin of the goods.

 The Ninth Circuit reads Section 1114 to include both confusion of goods and confusion of business. This interpretation is evident in Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir. 1963):

"The earlier trademark Act, that of 1905 (33 Stat. 724 et seq.), provided that a right of action to suppress an infringement of a registered mark arose only if the infringement was used on 'goods of the same descriptive properties' as the registrant's goods. However, the Lanham Act of 1946 (60 Stat. 427, 15 U.S.C. § 1051 et seq.) made plain that infringement might be found and prohibited, though the use of the registered mark was upon goods having different descriptive properties than those set forth in the registration, and though in consequence there was no actual competition between the parties. This Act prohibits use without the registrant's consent 'of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services.'

"Thus the question to be determined here is whether the use by Maier and Ralphs of the name 'Black & White' on their beer 'is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services.'"

Also, see Sunbeam Furniture Corp. v. Sunbeam Corp., 191 F.2d 141 (9th Cir. 1951), where the court held that actual competition is not needed, but there still must be a likelihood of confusion. That holding, which is often expressed by numerous other courts, is an inarticulate way of saying that confusion of goods (for which there must be direct competition) is not the only theory of trade-

mark infringement; confusion of source or businesses (for which there need not be competition) is also protected under the Lanham Act.

The test of likelihood of confusion is given in Paul Sachs Originals Co. v. Sachs, 325 F.2d 212 (9th Cir. 1963):

"There is a great profusion of cases on trademark infringement and unfair competition. The results in these cases in many instances may appear to be contradictory. On examination, however, it becomes clear that one test must be satisfied before either action will lie: There must be likelihood of confusion. Plough, Inc. v. Kreis Labs., 314 F.2d 635 (9th Cir. 1963). In determining likelihood of confusion, examination of prior cases is not very helpful except insofar as they indicate factors to be considered. A fairly good summation of these factors is found in Chester Barrie, Ltd., v. Chester Laurie, Ltd., 189 F.Supp. 98, 101 (S.D.N.Y.1960):

'Material to a determination of the "likehood of confusion" are inter alia: the area of concurrent sale; the extent to which the goods are related; the extent to which the mark and the alleged infringing name are similar; the "strength" or novelty of the plaintiff's mark; evidence of bad faith or intention of the defendant in selecting and using the alleged infringing name; and, evidence of actual confusion.'

Obviously, whether any or all of these factors weigh in favor of the relief sought is a matter to be determined in the first instance by the trial court on the facts of the particular case, and each case must stand on its own facts."

While discussing the test for likelihood of confusion for trade-mark infringement, there is a rule which is important in the instant case since there is evidence that the defendant knew of the existence of the plaintiffs and their use of the name "Wells Fargo" at the time the defendant appropriated the trade-

mark. The rule is well stated in the *Fleischmann Distilling* case:

"It is well settled that plaintiffs were not obliged in order to make a case against the defendants to prove a wrongful intent. Safeway Stores Inc. v. Rudner, 9 Cir., 246 F.2d 826, 829. But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit. American Chicle Co. v. Topps Chewing Gum, 2 Cir., 208 F.2d 560, 562; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603; National Van Lines v. Dean, 9 Cir., 237 F.2d 688, 692. As was said in the last cited case: '[I]f such an intent is shown, it raises a presumption that deception and confusion resulted.'

"Furthermore, Maier knew, just as we do, that it had open to it a whole dictionary full of words, an encyclopedia full of proper names, and a world atlas full of place names from which to select a non-offending label. The evidence shows that at the time Maier was using no less than 21 separate names or labels."

Callmann explains the rule, Vol. 3, p. 782:

"Absence of malicious intent or bad faith furnishes no defense to a trade-mark infringement action. However, proof of a subjectively fraudulent motive on the part of the defendant aids the court in finding that the intention has borne fruit. Such an intent is father to the presumption that the desired deception will be effected; 'Imitation may supply the place of proof; the plagiarist's motive can only be some advantage to himself, which is most likely to be, in part at any rate, the likelihood that his wares will be taken as first-comer's. It rests with

him to disprove this natural inference; until he does we may accept his own estimate of the probabilities.' The court will regard the defendant's opinion as expert and will not indulge in the assumption that it was erroneous, for he is presumably well informed as to the exact nature of trade in the articles with which he and his competitors are concerned."

■ In the instant case, if the defendant knew of plaintiffs use of "Wells Fargo" and intended to trade in on the prestige of plaintiffs' historic name, there is a presumption that the likelihood of confusion exists.

■■ In applying the likelihood of confusion test, the Court must remember that the Lanham Act has the dual purpose of protecting the registrant's trade-mark and protecting the public. Baker v. Simmons Co., 307 F.2d 458 (1st Cir. 1962). The ignorant, as well as the intelligent, must be considered when applying the likelihood of confusion test. A classical statement of the rule is found in Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2nd Cir. 1910):

"The law is not made for the protection of experts, but for the public— that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions."

■■ The application of the likelihood of confusion test to a confusion of goods cause of action under trade-mark infringement doesn't present much difficulty because the Court merely decides whether the defendant's mark is confusingly similar to the competitor plaintiff's trade-mark. If there is a likelihood of confusion between their goods or services because of the defendant's use of a similar mark, then trade-mark infringement exists. When the likelihood of confusion test is applied to a confusion of businesses cause of action, the test becomes a bit more difficult.

Competitors are no longer involved and the likelihood of confusion pertains to origin or sponsorship of the goods or services. The strength of the plaintiff's trade-mark and whether or not it has secondary meaning will become crucial. Several cases involving confusion of origin will clarify the concept.

In the "Seventeen" magazine cases, Hanson, et al. v. Triangle Publications, Inc., 163 F.2d 74 (8th Cir. 1947); Triangle Publications, Inc. v. Rohrlich et al., 167 F.2d 969 (2nd Cir. 1948), the plaintiff published, under the registered trade-mark "Seventeen", a magazine of fashions and other interests for teenage girls. In the first suit, the defendant Hanson manufactured dresses under the name "Seventeen", and in the second suit defendant Rohrlich manufactured girdles under the name "Miss Seventeen". In both cases, the respective Courts of Appeal held that the word "Seventeen", as used by the plaintiff, had acquired a secondary meaning and that its use by the defendants was likely to cause a confusion as to sponsorship by plaintiff, and the public might erroneously believe that defendants' dresses and girdles were advertised in or sponsored by the magazine and that plaintiff's reputation and good will would thereby be injured.

In Esquire, Inc. v. Maira, 101 F.Supp. 398 (D.C.Pa.1951), the Court found that plaintiff's trade-mark, "Esquire", used on their magazine had acquired a strong secondary meaning indicative in the public mind of a relationship between Esquire magazine and men's wearing apparel, styles, trends and fashions, and this secondary meaning was acquired prior to the time defendant began to use the name "Esquire Shop" for a retail clothing store.

In the "Seventeen" and "Esquire" cases, the courts emphasized the strength of the trade-mark in affording broad protection under the confusion of sponsor theory. In other cases where the court found the trade-mark to be weaker, less protection was afforded the

trade-mark. The defendant in the instant case relies on General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (D.C.W.D.Mich.1964), in which the court held that the defendant boat manufacturer did not infringe plaintiff's statutory or common law trade-mark "Cadillac" by using that name on its boats. The case does not stand for the proposition that there can be no trade-mark infringement between two unrelated noncompetitors, as the defendant states, but, rather, the rule is that a weak trade-mark is afforded less protection. The Court held that a geographical and historical trade-mark, like "Cadillac", is known as a weak or nonexclusive mark and it is only entitled to very narrow protection. Because of the narrow protection afforded the "Cadillac" trade-mark, the Court held that there was no likelihood of confusion.

The defendant also relies on the Ninth Circuit case of Sunbeam Furniture Corp. v. Sunbeam Corp., 191 F.2d 141 (9th Cir. 1951), because the Court refused to enjoin a household furniture seller from using the name "Sunbeam", such name being the trade-mark for the plaintiff's small electrical appliances. Again, the Court clearly recognized that the suit was based upon likelihood of confusion of source, but merely held that the evidence revealed no confusion or likelihood of confusion. The Court emphasized that a fanciful or arbitrary word will be broadly protected, but a meaningful word or "common word like 'Sunbeam'" has a limited range of protection.

The above cases are illustrative of the importance of the strength of the trade-mark in determining the scope of protection and in the application of the likelihood of confusion test. The courts often state that the fanciful or arbitrary trade-mark is very strong and has acquired secondary meaning. Concerning secondary meaning, it was said in G. & C. Merriam Co. v. Saalfield, 198 F. 369 (6th Cir. 1912):

"It contemplates that a word or phrase originally, and in that sense

primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark."

The criteria set forth for the establishment of secondary meaning are simply stated as a combination of elements such as long-term usage, considerable effort and expenditure by the producer toward developing a reputation and good will for the trade-mark, resulting in a conscious connection in the minds of the general public of that trade-mark to the producer's particular business and products or service. In the instant case, the trade-mark "Wells Fargo" would have secondary meaning if, in the minds of the public, the term has come to mean a bank or the transportation of valuables. Of course, the question of secondary meaning, like the question of likelihood of confusion, is for the trier of the fact.

 Dilution as a theory of unfair competition is not within the protection of the Lanham Act; it is part of the common law of unfair competition. Since the Court has diversity jurisdiction, the state law of unfair competition will apply to the dilution cause of action. In many cases, the courts say the state law of unfair competition will prevail, but then say that the elements of common law unfair competition are the same anyway. In the *Sunbeam* case, supra, the Ninth Circuit said the California state law of unfair competition, which was applicable in that case, is the same as the "general" law of unfair competition. Unless the state has a specific statute, the courts all turn to the classical national cases on unfair competition. Since there is very little law in Nevada dealing with unfair competition, and since none dealing with dilution can be found, a discussion of the general law

of dilution, as found in the classical cases, is appropriate. As of 1969, there were twelve states which had adopted an antidilution statute or incorporated an antidilution clause into their trade-mark laws, but Nevada is not one of the twelve, so the common law of unfair competition will apply.

 Dilution, as a theory of trade-mark protection, is not a new concept. Even under the 1905 Act, which was replaced by the broader Lanham Act, the courts started to recognize dilution. The classical case which recognized dilution and explained its philosophy was Yale Electrical Corp. v. Robertson, 26 F.2d 972 (2nd Cir. 1928), involving locks and flashlights, in which Judge Learned Hand said:

". . . it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

Another famous case, very relevant because it involved similar corporate names, as does the instant suit, is Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7th Cir. 1963). The Court relied on a Supreme Court case to decide that the dilution theory was appropriate. The Court also had an Illinois antidilution statute to work with, but it is important to note that the Court held "that plaintiff is entitled to injunctive relief against defendant, as prayed for in its

complaint, for either unfair competition or for a violation of the Illinois Anti-dilution Statute, or both . . . ."

The Court reasoned:

"In the beginning, we quote a statement from the Supreme Court in American Steel Foundries v. Robertson, Commissioner, et al., 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317, which we think is highly relevant to the instant situation. The Court stated:

'The effect of assuming a corporate name by a corporation under the law of its creation is to exclusively appropriate that name. It is an element of the corporation's existence. Newby v. Oregon Cent. Ry. Co., et al., Deady 609, 616; s. c. 18 Fed.Cas. 38, Case No. 10,144. And, as Judge Deady said in that case:

' "Any act which produces confusion or uncertainty concerning this name is well calculated to injuriously affect the identity and business of a corporation. And as a matter of fact, in some degree at least, the natural and necessary consequence of the wrongful appropriation of a corporate name, is to injure the business and rights of the corporation by destroying or confusing its identity."

'The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade name where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such identity, to the injury of the corporation to which the name belongs. [Citing cases.]' "

The Court went on to hold:

"In our view and we so hold, the District Court erred in denying injunctive relief to plaintiff, based upon its cause of action charging unfair competition. Paraphrasing the language of the Supreme Court in American Steel Foundries v. Robertson et al., 269 U.S. 372, 381, 46 S.Ct. 160, 70 L.Ed. 317 (heretofore quoted), equity will enjoin the appropriation and use of the name of a corporation where the resemblance is so close that it is likely to produce confusion, to the injury of the corporation to which the name belongs."

Dilution was also recognized in the *Esquire* case, supra, although the Court also relied on the confusion of business theory. The Court said, in 101 F.Supp. 398 at page 402:

"It is true that the Defendant does not and probably will not deprive the Plaintiff of trade in the sale of its magazine, but, nevertheless, Defendant's use of the name 'Esquire Shop' has enabled the Defendant to get a free ride upon the good will and reputation built up by the Plaintiff, and to that extent the value of Plaintiff's property right in its trade-mark is diluted and rendered less valuable."

Dilution is clearly recognized in the Ninth Circuit, starting with Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948):

"(a) 'Reaping Where One Has Not Sown'.

"The decisions frequently refer to this sort of imitation as 'reaping where one has not sown' or as 'riding the coattails' of a senior appropriator of a trade name.

"By whatever name it is called, equity frowns upon such business methods, and in proper cases will grant an injunction to the rightful user of the trade name.

"In Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc., 5 Cir., 123 F.2d 582, 584, certiorari denied, 315 U.S. 824, 62 S.Ct. 917, 86 L.Ed. 1220, the court used the following language:

'This purpose is to project itself into that business arena panoplied in a name already favorable known, rather than to come into it on its

own merits, and slowly building, here a little, there a little, establish its own place. * * * [Many cases cited]'

'These cases all hold that where as here it plainly appears that there is a purpose to reap where one has not sown, to gather where one has not planted, to build upon the work and reputation of another, the use of the advertising or trade name or distinguishing mark of another, is in its nature, fraudulent and will be enjoined.'

"In Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 150 A.L.R. 1056, certiorari denied, 321 U.S. 781, 782, 64 S.Ct. 638, 88 L.Ed. 1074, the court declared that 'There is no merit in the contention that a court of equity will not afford protection to the plaintiff's trademark or prevent its good will from being nibbled away by unfair competitors.'"

In Fairway Foods v. Fairway Markets, 227 F.2d 193 (9th Cir. 1955), the Court stated, in dicta: "It is true that unfair trade may result from the dilution of the business good will in ways not connected directly with the possible loss of a sale through deception or confusion . . .", citing the *Stork Restaurant* case. In the Black & White Scotch case, Fleischmann Distilling Corp. v. Maier Brewing, supra, the Ninth Circuit said, 314 F.2d at page 161:

"This disposition of the case makes it unnecessary to consider appellants' argument that our case of Stork Restaurant v. Sahati, supra, is authority for the proposition that wholly apart from any likelihood of confusion as to the origin of a product, a trademark owner may enjoin use by another which results in dilution of the distinctiveness of the owner's mark. Since we have found likelihood of confusion here we need not consider this argument."

G.

### *Have the Plaintiffs Stated Claims for Relief?*

With the understanding that trademark infringement and unfair competition involve the three distinct theories of confusion of goods, confusion of business or origin and dilution, have the plaintiffs stated a claim under any of the theories?

1. Confusion of Goods.

Plaintiffs allege a violation of 15 U.S.C. § 1114(1)(a) which encompasses the theory known as likelihood of confusion of goods. This theory requires the parties to be competitors and the defendant, by use of a similar trademark, creates a likelihood of confusion by passing off his goods or services as those of the plaintiff. The first element necessary for the claim under 15 U.S.C. § 1114(1)(a) is that the plaintiffs have a properly registered trade-mark. It appears that the plaintiffs incontestably own the trade-mark "Wells Fargo" and have properly registered it. In fact, the defendant has admitted the incontestability. (Plaintiffs' Request for Admission 24, admitted by defendant's response of December 11, 1970.)

For the confusion of goods claim, the plaintiffs rely on plaintiff Baker's U. S. Trademark Registration of Wells Fargo, No. 891,203 for the transportation of money and valuables. Included within this registration is "Electrical and/or electronic sensing, transmitting and alarm signal devices used for or in connection with central station and other protective security systems and operations, and parts thereof in Class 21 (int. cl. 9)." Under this registration Baker has been manufacturing and selling various electrical and electronic security devices, including coin handling devices which are employed in their "coin auditing", paymaster, and bank depositing services. According to the plaintiffs, Mr. Davies, the inventor for the defendant, developed a device for elec-

trically accepting genuine coins and rejecting slugs and counterfeits. Mr. Wilkinson, on September 13, 1971, described the product as having "multi-million dollar" potential and they hoped to promote it with demonstrations in New York, Los Angeles and Chicago. (Plaintiff Baker's opposition to Defendant's Motion for Partial Summary Judgment, 9/71, page 7.)

The plaintiffs' confusion of goods theory is very simple: Baker owns the trade-mark "Wells Fargo" for coin auditing and various electrical and electronic security devices; the defendant, named Wells Fargo Express Company, is manufacturing such devices; there will be confusion between the goods, i. e., it is likely that the defendant's product will be mistaken for that of the plaintiff Baker. The defendant's product will be passed off as the plaintiff's.

The plaintiffs have stated a claim under 15 U.S.C. § 1114(1)(a) under the likelihood of confusion of goods theory. It should be noted that even if the parties aren't competitors with the security devices, the facts would also state a claim under the confusion of origin theory. It would be likely that the defendant could be confused as part of or sponsored by the plaintiffs.

2. Confusion of Business.

 The confusion of business or origin theory is also within 15 U.S.C. § 1114(1)(a) and the claim is very simply stated: the use of the name "Wells Fargo" in the defendant's corporate name and the advertising of this name creates confusion in that the public is misled into believing that the defendant is the plaintiff, a part of the plaintiffs, or somehow sponsored by the plaintiffs. 15 U.S.C. § 1114(1) provides in pertinent part:

"Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;"

Plaintiffs claim that the use of the name Wells Fargo in the yellow pages of the Las Vegas telephone directory, the use of the name on the office door and office directory, and the use of the name on the letterhead of the stationery and checks will cause a likelihood of confusion between the two parties.

The plaintiffs further claim that the defendant offered for sale various inventions made by Mr. Davies. Since these products were being sold by the defendant which was named Wells Fargo Express Company, the plaintiffs assert that there will be a likelihood of confusion as to sponsorship and origin.

The plaintiffs have stated a claim under 15 U.S.C. § 1114(1)(a) under the likelihood of confusion of business theory.

3. Dilution.

 The dilution claim, not encompassed within the Lanham Act, but existing as a theory of the common law of unfair competition, is found in the charging paragraph 38 of the complaint:

"38. . . . irrespective of the precise goods sold and/or services rendered by said defendant and its affiliates, so long as the name 'Wells Fargo' is used by defendant and such affiliates as any part of a trade name or trademark, particularly when in conjunction with the words 'express company', at least an association with, or sponsorship by, plaintiff Baker Industries is highly likely to be assumed or implied. The likelihood of confusion arising from any such assumption or implication threatens to impair the expansion and growth of Baker Industries, Inc., under the name and mark 'Wells Fargo' in this District, in and among the several states of the United States, and in foreign commerce."

This can be read as stating a claim for both confusion of business or origin and a claim for dilution. The dilution

claim is very simple: the mere presence of the words "Wells Fargo" in the defendant's name is giving the defendant a free ride on the plaintiffs' historically valuable trade-mark and good will. The plaintiffs' rights in the name are thereby diluted and their reputation and good will are left unprotected.

The plaintiffs have stated a claim for unfair competition under the dilution theory.

4. Nevada Law of Unfair Competition.

Although neither party discussed state law of unfair competition, it is clear that the state law is applicable and a state statute, if there is one, would control. The Nevada trade-mark law, NRS 600.010 et seq., is inapplicable because apparently neither party registered the contested trade-mark with the Nevada Secretary of State, which is a prerequisite to using the statutory remedies.

NRS 78.035 provides:

"The certificate or articles of incorporation shall set forth:

1. The name of the corporation, which shall not be the same as, or deceptively similar to, the name of any other corporation formed or incorporated in this state or of any foreign corporation authorized to transact business within this state . . ."

Apparently the plaintiffs are not authorized to do business in Nevada or they could avail themselves of the statute. In the instant case, the defendant took the name of a foreign corporation, so the statute is of no help. The Nevada Attorney General, in Opinion 244, 1961, states that the law of unfair competition would apply in a situation much like the instant one. In Opinion 244, the Attorney General said no Nevada statute prevents a person from filing a fictitious name which is the same as an existing Nevada corporation, but the common law of unfair competition would afford a remedy to the corporation if the names were deceptively similar. Therefore, in the instant case, even though the plain-tiffs are not Nevada corporations and NRS 78.035 does not apply, Nevada still would afford relief under a deceptively similar theory of unfair competition. In LeFebure Corp. v. Lefebure, Inc., 284 F.Supp. 617 (D.C.E.D.La.1968), the Court interpreted a Louisiana statute identical to NRS 78.035 and said, "[I]t is clear that a foreign corporation does not have to qualify to do business nor incorporate in this State in order to protect its corporate name, when usurpation of its name amounts to unfair competition . . ."

Even though plaintiffs are not Nevada corporations, they have stated a claim under Nevada law for unfair competition because of the deceptive similarity between the corporate names.

## H.

### Defendant's Arguments that Plaintiffs Have Failed to State Claims for Relief

Throughout the defendant's briefs and oral argument, the defendant speaks as though confusion of goods is the only theory of unfair competition. The defendant has failed to respond adequately to the confusion of business and dilution theories. Repeatedly the defendant stresses that the corporation was dormant for many years, the corporation has never made a profit, the corporation has never sold a product, and the corporation is not in competition with the plaintiffs. All of these arguments may be relevant to the confusion of goods, passing-off theory, but they do not help with the confusion of business and dilution theories.

1. Hertz Case.

The defendant argues that Hertz Corp. v. Knickerbocker, 206 F.Supp. 305 (S.D.N.Y.1962), is precisely on all fours with the instant case and therefore the plaintiffs' complaint should be dismissed. The plaintiff was the owner of the service mark "Hertz" for the rental of automobiles and trucks. The defendants organized a membership corporation known as the "Association of Hertz

Licensees, Inc." Before the defendants did any further act, the plaintiff sued for trade-mark infringement and merely listed the articles of incorporation in the complaint. The Court held that the action could not be maintained without alleging that the defendant had used such mark in commerce and in conjunction with services, although defendants' certificate of incorporation indicated an intention to make such use. The Court said, "The Lanham Act does not afford protection against intention, but only against overt acts. Until something is done to carry out the announced purposes of the organization, the protection of plaintiffs' mark has not been invaded."

The *Hertz* case is hardly on all fours with the instant situation. For the *Hertz* case to be analogous, the plaintiffs would have sued the defendant back in the early 1960's when the defendant was just a dormant shell. But the plaintiffs waited until the defendant did some acts which allegedly affect interstate commerce and infringe the plaintiffs' trade-mark. In *Hertz,* the complaint was dismissed because the plaintiff failed to allege an act which was within the Lanham Act. In the instant case, the plaintiffs have alleged that the defendant advertised, offered services and goods for sale, and did other infringing acts. It is clear that the complaint states a claim within the Lanham Act.

Further, in the *Hertz* case, the Court held that there was no jurisdiction over the subject matter because of lack of acts in commerce. Since the Court lacked jurisdiction for the trademark infringement cause of action, the second cause of action for unfair competition was dismissed because there was no ground for finding pendent jurisdiction. Evidently there was not diversity of citizenship jurisdiction like there is in the instant case. Since the unfair competition claim was dismissed, the Court didn't consider the dilution theory and did not pass on whether the mere use of the name "Hertz" in the corpo-

rate name of defendant would state a claim for dilution. The Court addressed itself only to whether a claim was stated under the Lanham Act. Therefore the case is not authority for the proposition that the mere use of a trade name in a corporate name of a defendant is not actionable.

2. Defendant's Business is Small.

 Defendant seems to intimate that because the Nevada corporation is small in relation to the giant plaintiffs, the Court should not allow the complaint. This argument was laid to rest in Stork Restaurant v. Sahati, supra, where the Court held that "A disparity in the Size of the Respective Businesses, Will Not Bar Injunctive Relief". Actually, the fact that defendant's business is small would not bar the claim but, rather, goes to the issue of whether likelihood of confusion exists.

3. Plaintiffs' Damages are De Minimis.

 The defendant argues that the alleged infringement was for such a short period of time prior to the name change to Modern Research that the damages would be de minimis and the complaint should be dismissed for failure to state a claim. There is some scant authority for this proposition. In Ye Old Tavern Cheese Prod., Inc. v. Planters Peanuts Div., 261 F.Supp. 200 (N.D.Ill.1966), the Court dismissed a claim because "Plaintiff has not shown any damages or harm resulting from this specific act. Any sales which actually occurred would have been minimal." The defendant also cites several other cases where the Court denied relief because any damage was de minimis.

The defendant relies on the "Seventeen" magazine case, supra, for the rule that there will be no accounting of profits or damages unless the parties were in competition. Since the "Seventeen" case dealt with confusion of origin and dilution, the rule would seem to be that only injunctive relief is available under these theories. The defendant reasons that since there

is no competition, there can be no damages and since the defendant has changed its name, there will be no injunctive relief, so the claim should be dismissed.

The defendant's argument fails for several reasons. First, the de minimis rule for rejecting a claim, if there is such a rule, does not exist in the Ninth Circuit. The Ninth Circuit rule is that the extent of damages is a question of relief to be decided only after the issue of liability. In Neal v. Thomas Organ Co., 325 F.2d 978 (9th Cir. 1963), a copyright infringement case, the trial court found the duplication to be slight and dismissed the claim because the misappropriation was de minimis. The Court of Appeals reversed the application of the de minimis rule, saying:

"We believe such reasoning should not be followed in determining whether there had been actionable misappropriation. Either there had been such actionable misappropriation, or there had not been. If the former, no matter how slight, a cause of action existed. If the damage was so slight as to be de minimis, that rule would justify either a judgment for defendant, or more preferably (because more accurate), an award of nominal damages, such as one dollar or one cent. In other words, the court's problem was one of remedies, to be arrived at only after a determination that actionable misrepresentation existed."

Second, the damages in the instant case cannot at this stage of the proceedings be said to be de minimis because the Ninth Circuit, contrary to "Seventeen", allows an accounting of profits and damages even where there is no competition. In most of the unfair competition cases based upon dilution, the courts are aware of the difficulty of showing damages, but the courts conclude, like the Ninth Circuit did in *Stork Restaurant*, that "No one need expose his reputation to the trade practices of another, even though he can show no pecuniary loss."

In Maier Brewing Company v. Fleischmann Distilling Corp., 390 F.2d 117 (9th Cir. 1968), the Black & White Scotch case, the Ninth Circuit considered and rejected the "Seventeen" rule and held that an accounting of profits may be available in a confusion of business or dilution case even though there was no competition between the parties. The Court said:

"Although courts will protect this psychological value of the trade-mark by means of an injunction against infringement, even where the products are of different descriptive qualities and are, therefore, not in competition (Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir. 1963)), those courts which treat an accounting solely as a method of compensating for the diversion of customers fail to fully effectuate the policies of the Act. Such courts are neither 'securing to the owner the good will of his business [nor] protecting the public against spurious and falsely marked goods.' See Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., supra, 349 F.2d [389 (2 Cir.)] at pages 395–396."

"These courts are protecting the trade-mark owner from only the most obvious form of damages—the diversion of sales, and are not in fact providing protection to the value of the good will built up in the trade-mark itself. No recognition is given to the possibility that customers who believe that they are buying a product manufactured by the plaintiff—whether such product is competitive or non-competitive—may be so unhappy with that product that they will never again want to buy that product or any other product produced by the same manufacturer, who they believe to be the plaintiff. Nor do these opinions recognize that, even if the infringing product is of higher quality than that bearing the registered trade-mark, the trade-mark registrant has been deprived of his right to the exclusive

use and control of the reputation of his product.

\* \* \* \* \* \*

"Since it is fairly apparent that the use of an accounting of profits solely as a means of compensating the trade-mark registrant for sales which have been diverted to the infringer is somewhat less than wholly effective in fulfilling the goals of the Lanham Act, we must determine whether the utilization of the unjust enrichment rationale is in fact more effective, and if it is, whether such a utilization is permissible under the Act.

\* \* \* \* \* \*

"Thus, it must be determined if the concept of unjust enrichment, utilized 'subject to the principles of equity', will properly serve to effectuate the policies of the Lanham Act. It would seem that it would. The utilization of this concept will not of course make an accounting of profits automatic. Situations will exist where it would be unduly harsh to grant such recovery. Cases exist where the infringement is entirely innocent; where rather than attempting to gain the value of an established name of another, the infringer has developed what he imagined to be a proper trade name only to find out later that his name caused confusion as to the source of, and therefore infringed, a product with a registered trade-mark. See e. g., Highway Cruisers of Cal., Inc. v. Security Industries, Inc., 374 F.2d 875 (9th Cir. 1967). In such a case an injunction fully satisfies both the policy of the Act and the equities of the case. Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947).

"Where, however, the infringement is deliberate and wilful, and the products are non-competitive, both the trade-mark owner and the buying public are slighted, if the court provides no greater remedy than an injunction. As the court said in Admiral Corp. v. Price Vacuum Stores, Inc., 141 F.Supp. 796, 801 (E.D.Pa.1956):

'It seems scarcely equitable \* \* \* for an infringer to reap the benefits of a trade-mark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss. To impose on the infringer nothing more serious than an injunction when he is caught is a tacit invitation to other infringement.'

"It would seem fairly evident that the purposes of the Lanham Act can be accomplished by making acts of deliberate trade-mark infringement unprofitable. In the case where there is direct competition between the parties, this can be accomplished by an accounting of profits based on the rationale of a returning of diverted profits. In those cases where there is infringement, but no direct competition, this can be accomplished by the use of an accounting of profits based on unjust enrichment rationale. Such an approach to the granting of accountings of profits would, by removing the motive for infringements, have the effect of deterring future infringements. The courts would therefore be able to protect the intangible value associated with trade-marks and at the same time be protecting the buying public from some of the more unscrupulous members of our economic community."

In the recent case of Kimberly Knitwear, Inc. v. Kimberley Stores Inc. of Mich., 331 F.Supp. 1339 (W.D.Mich. 1971), the Court recognized the dilution cause of action, relying on the Ninth Circuit *Stork Restaurant* case, and held that an order for accounting of profits lies within the discretion of the Court. The Court decided that the plaintiff would be fully protected by a restraining order preventing future injury and no accounting of profits was ordered because the plaintiff had not suffered a substantial monetary loss.

Therefore, the defendant's de minimis argument for dismissing the plaintiffs' complaint should be rejected.

## 4. Mootness Due to Name Change.

The Nevada defendant changed its name from Wells Fargo Express Company to Modern Research, Inc., on October 7, 1970, some three weeks after the plaintiffs filed their complaint in the instant suit. The defendant argues that since the damages in the case will be de minimis and since the alleged infringement was voluntarily discontinued, the case is moot, i. e., there is no case or controversy, so the suit should be dismissed.

As explained previously, the defendant's reliance on the de minimis rule is futile, because even if the issue of whether or not an injunction should issue is moot, the plaintiffs still have a right to an adjudication of past infringement. The defendant argues that no injunction can issue because there is no threat of future infringement. Accepting arguendo the defendant's theory, there is still a case or controversy regarding past infringement and the plaintiffs' rights to an accounting of profits and damages. The injunctive issue is one of relief to be considered after the issue of liability is resolved.

Does the Court have jurisdiction to issue an injunction after the defendant voluntarily ceased the alleged infringement? In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1952), the United States was suing various corporations and an individual for alleged violation of Clayton Act provisions which relate to interlocking directorates. The defendants moved to dismiss the suit because the individual defendant had voluntarily resigned as a director in the competing corporations. In United States v. W. T. Grant Co., et al., 112 F.Supp. 336, the District Court stated the following rule enunciated by Judge Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir. 1945):

"* * * The mere cessation of an unlawful activity before suit does not deprive the court of jurisdiction to provide against its resumption; a

'case or controversy' may remain to be disposed of. There are plentiful authorities so holding. To disarm the court it must appear that there is no reasonable expectation that the wrong will be repeated."

The District Court dismissed the suit because there was not the slightest hint that the defendants would attempt any future activity in violation of the Clayton Act. The Supreme Court affirmed the dismissal and stated the following considerations:

"Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot. United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Walling v. Helmerich & Payne, Inc., 1944, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754. A controversy may remain to be settled in such circumstances, United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 448, e. g., a dispute over the legality of the challenged practices. Walling v. Helmerich & Payne, Inc., supra; Local 74 United Brotherhood of Carpenters, etc., v. National Labor Relations Board, 1951, 341 U.S. 707, 715, 71 S.Ct. 966, 970, 95 L.Ed. 1309. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. United States v. Trans-Missouri Freight Ass'n, supra, 166 U.S. at page 309, 310, 17 S.Ct. 546, 547. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right, National Labor Relations Board v. General Motors Corp., 2 Cir. 1950, 179 F.2d 221. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.

"Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. Hecht Co. v. Bowles, supra; Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 1916, 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248. The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587 and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."

The rule, stated by Callmann, Vol. 4, at page 178, is:

"When injunctive relief is sought to restrain a continuing wrong and the respondent claims to have abandonded the challenged conduct, the court must determine whether, in fact, the unlawful conduct has been discontinued or whether the threat to the petitioner persists. If it does, an in-junction should issue; if not, it should be refused."

There are several cases which hold that if the defendant is a wanton infringer or has displayed an unmistakable proclivity for unfair business practices, the aggrieved party 'will not be obliged to accept his bland assurance of discontinuance or modification. Discontinuance by itself does not justify the denial of injunctive relief, especially if there is no guaranty that it will be permanent. In the instant case, the defendant has filed an affidavit stating that it has no intention of resuming the use of the name "Wells Fargo", but the defendant still insists that it had the right to use that name. In several cases, discontinuance of the infringement has been held to be singularly insignificant if the party charged persists in claiming the right to do that which he has discontinued or contests "every step of the case to put the claimants to the expense of proving every fact necessary to establish their right." See Callmann, Vol. 4, p. 183.

Therefore, the injunctive issue is purely discretionary with the Court and should not be resolved until the issue of infringement has been solved. The fact that the defendant voluntarily changed its name may be grounds for ultimately denying injunctive relief, but it is not grounds for dismissal due to mootness because the prior infringement question would still persist.

## I.

### Is the Case Ripe for Summary Judgment?

The rule laid down in certain early patent cases that summary judgment would not be granted on issues of validity or infringement was extended to early trade-mark infringement and unfair competition cases. This restrictive doctrine on the use of the summary judgment procedure has been authoritatively repudiated in both the patent and trade-mark areas. Where there is no genuine issue of material fact as to validity and infringement and the moving

party is entitled to judgment as a matter of law, the granting of summary judgment is clearly appropriate. The motion will be denied where the absence of a genuine issue of material fact is not clearly established.

Appellate courts have cautioned that the questions ordinarily involved in the trade-mark cases do not readily lend themselves to summary judgment. In Marcus Breier Sons v. Marvlo Fabrics, 173 F.2d 29 (2nd Cir. 1949), the Court stated "Disputes between parties as to trade-mark validity and infringement can rarely be determined satisfactorily on a motion for summary judgment." In Avrick v. Rockmont Envelope Co., 155 F.2d 568 (10th Cir. 1946), an action for unfair competition and trade-mark infringement in which intent was a material fact, the Court reversed a summary judgment for the defendant and said:

"In cases of this kind where no single factor controls the equation, and the court is necessarily required to resolve the question of alleged intent in arriving at its judgment, we are of the opinion that justice can best be served by a trial of the question on its merits."

Therefore, if there is any special rule with regard to summary judgment in trade-mark infringement and unfair competition cases, it is simply that the trial court must be careful because there are many issues of fact and any one genuine issue of material fact will make the granting of summary judgment erroneous.

The current posture of summary judgment in the Ninth Circuit is expressed in Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969):

"When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleading. As stated in Rule 56(e), his response by affidavits or otherwise must set forth specific facts showing that there is a genuine issue for trial. If he does not

so respond, summary judgment, if otherwise appropriate, shall be entered against him. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L. Ed.2d 569. One against whom a motion for summary judgment is filed is therefore under a duty to show that he can produce evidence at the trial, and is not entitled to a denial of that motion upon the unsubstantiated hope that he can produce such evidence at the trial. International Longshoremen's and Warehousemen's Union v. Kuntz, 9 Cir., 334 F.2d 165, 169."

The plaintiffs in their briefs listed numerous factual issues which they believed would prevent the entry of summary judgment. The defendant denied the existence of several factual issues and admitted the position taken by the plaintiffs with regard to several of the alleged disputed factual issues. The defendant said that there probably was a factual issue, but for the purpose of the motion for summary judgment the plaintiffs' version is taken as true, yet the defendant is still entitled to judgment as a matter of law. In summary, what the defendant did was to go too far in admitting facts in its effort to create an absence of a genuine issue of material fact. At the oral argument on June 8, 1972, the defendant made admissions until there was probably no longer any genuine issues for trial, but the defendant made so many admissions for the purposes of the summary judgment motion that it was no longer entitled to judgment as a matter of law. In getting rid of the genuine issues, the defendant also lost its entitlement to judgment as a matter of law.

1. Are There Genuine Issues of Material Fact?

(a) Did the defendant offer for sale any goods or services?

This is one element of a prima facie case of trade-mark infringement under the Lanham Act (the other two elements being lack of consent and likelihood of confusion). Therefore, it is a material

factual issue. Is there a genuine dispute? The defendant argues that no goods or services were ever offered for sale or sold under the "Wells Fargo" name. The plaintiffs argue that the depositions of Mr. J. O. Roberts and Mr. William Ritter, taken in September 1971, indicate that these gentlemen devoted a great deal of their time demonstrating the prototypes of Mr. Davies, the defendant's inventor, to prospective manufacturers and users throughout the country. The defendant counters with affidavits of the same witnesses saying they thought they were demonstrating the prototypes for Salem or Wilky at the time, even though Salem had not yet acquired the assets of the defendant at that time. There is a genuine issue as to whether the prototypes were demonstrated and offered for sale under the defendant's then corporate name of Wells Fargo Express. The affidavits do not satisfactorily resolve this dispute.

At the oral argument for summary judgment on June 8, 1972 (Tr. pp. 54, 57, 58), the defendant admitted, for the purposes of his summary judgment motion, that the Wells Fargo Express Company prototypes were carried into other states in a futile attempt to promote them. The defendant argues that as a matter of law that factual admission is not trade-mark infringement. Once again the defendant erroneously states that the "passing-off" of goods between competitors is the only theory of trade-mark infringement or unfair competition. The defendant states (but does not prove) that there is no competition so there could not possibly be trade-mark infringement or unfair competition. The defendant ignores the confusion of business and dilution theories.

By making the admission, the defendant has established one of the elements of a trade-mark infringement claim. Whether or not the defendant is entitled to judgment as a matter of law would depend on whether the other elements are lacking. It is to be remembered that the defendant made the admission only for its summary judgment motion.

If the plaintiffs were able to prove that the defendant did offer goods and/or services for sale under the Wells Fargo name, they would probably be entitled to judgment because the likelihood of confusion could be established under the confusion of business or source theory, which the defendant completely ignores. To summarize, the defendant argues that competition is a necessary element of trade-mark infringement; no competition exists here; hence, even if the goods or services were offered for sale, there is still not a valid claim. This ignores the confusion of business and dilution theories which prevent judgment as a matter of law for the defendant because of the admission.

(b) Did the defendant negotiate for the purchase of real estate while using the name Wells Fargo?

The dispute is genuine because the depositions are directly contradictory with regard to whether the negotiations were in the name of Wells Fargo or in the name of Salem. Again, the defendant, at the oral argument (Tr. pp. 54, 57, 58), admitted that the negotiations were carried out in the name of Wells Fargo Express Company, but argues that the defendant is still entitled to judgment as a matter of law. The defendant argues that the Lanham Act prohibits the use of the trade-mark in commerce only "in connection with the sale, offering for sale, distribution, or advertising of any goods or services . . . ." The defendant argues that the buying of real estate is not passing-off and is not prohibited by the Lanham Act. The defendant's analysis of the Lanham Act is probably correct (although an argument can be made that the use of the name in real estate negotiations could be "advertising" within the Act), but the defendant again fails to take cognizance of the dilution theory and a confusion of business theory of unfair competition. The use of the trade-mark in real estate negotiations could certainly dilute the value of plaintiffs' trade-mark and confusion of business could probably exist. Therefore, the de-

fendant's admission prevents judgment as a matter of law.

 (c) Has the defendant used the "Wells Fargo" trade-mark to advertise any goods or services?

The defendant admits the listing in the yellow pages of the Las Vegas telephone directory, admits the use of the name on the stationery and checking account, and admits the use of the name on the corporate office door and building directory. The defendant argues that there is no trade-mark infringement as a matter of law because there was no passing-off of goods by this so-called advertising. The defendant also argues that there is no competition and the plaintiffs own the trade-mark for specific goods and services, one of which is not research and development. The defendant has a difficult time in explaining how, despite the alleged advertising, there should be judgment as a matter of law. Without even referring to the confusion of business or dilution theories, the advertising appears to come precisely within the prohibitions of the Lanham Act. Section 1114(1) says in part that no person shall use the trademark "in connection with the . . . advertising of any . . . services . . . in connection with which such use is likely to cause confusion." If the yellow pages listing is advertising, the defendant appears to be squarely within the prohibition if the likelihood of confusion exists. All of the defendant's arguments about no competition and no sales and no profits would not be relevant to this infringing act.

The issue is whether or not the yellow pages listing and the other uses of the name "Wells Fargo" are "advertising". This would seem to be a factual issue which needs resolution. If the yellow pages listing is "advertising" which may create a likelihood of confusion as to source or goods, it would seem to be the plaintiffs who are entitled to judgment as a matter of law, rather than the defendant. In fact, the advertising is the infringing act which the plaintiff Baker relies on in its motion for partial summary judgment, filed February 22, 1971. If the yellow pages listing is "advertising", the plaintiff's motion for partial summary judgment could be granted. The issue of whether the listing is advertising is a genuine factual issue which should be resolved at trial, since there are other factual issues necessitating a trial anyway.

 (d) What is the strength of the trade-mark "Wells Fargo"? Has it acquired secondary meaning?

Before the Court can decide whether certain acts by the defendant have infringed the plaintiffs' trade-mark or constituted unfair competition, the scope of protection to be afforded the words "Wells Fargo" must be determined. The scope of protection depends upon the strength of the trade-mark. Sunbeam Lighting Co. v. Sunbeam Corp., 183 F.2d 969 (9th Cir. 1950). As explained by Callmann, Vol. 3, at page 1503:

> "In essence, the distinctiveness and popularity of the trademark will determine its relative strength or weakness and will accordingly define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already been educated to accept it as the hallmark of a particular source. Then too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both. It seems to follow as a necessary conclusion that the trademark has the advantage of strength where its owner has invested a considerable amount in advertising or can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business . . . . If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly mar-

keted. Only the strong mark will be protected against infringements arising out of its use in connection with noncompeting goods."

The plaintiffs assert that the Court could take judicial notice of the strength of the trade-mark because of the fame and honor of the historic Wells Fargo & Company as the operator of the express services commenced in 1852 and first established in American history by the famous stagecoach and "Pony Express" operated by it and its predecessors whereby the Great West of this nation was developed. But the defendant argues that the trade-mark has been weakened and diluted by the prior uncontrolled use of the name "Wells Fargo" by many unrelated companies. The defendant argues that the use of the trade-mark by the two unrelated plaintiffs evidences the weakness of the mark. Therefore, there is a geniune factual issue with regard to the strength of the trade-mark.

The strength of the trade-mark issue also encompasses the question whether the trade-mark has acquired secondary meaning. To the public, do the words "Wells Fargo" merely mean a descriptive term, or have the words taken on a secondary meaning other than the primary connotation? Has the trade-mark come to be used in a fictitious, arbitrary and fanciful manner so that it has secondary meaning and is therefore afforded stronger protection? To the public, do the words "Wells Fargo" mean "the transportation of money or valuables" or "banking services"?

(e) Do the defendant's prototypes infringe plaintiff Baker's U. S. Trademark Registration No. 891,203?

This issue is material to the trademark infringement claim under the Lanham Act which proceeds on the confusion of goods theory. If a trade-mark is registered for a certain product and then an unauthorized user of the trademark uses the mark on the same product, the likelihood of confusion would be per se and the only issue would be whether the trade-mark was used on the product. The plaintiff Baker argues that Registration No. 891,203 for the transportation of money and valuables includes "electrical and electronic" security devices. One of the defendant's prototypes, according to the plaintiff Baker, is a device for electrically accepting genuine coins and rejecting slugs and counterfeits. Plaintiff says this product is the same as its coin handling device which is covered by the registered trade-mark. The defendant steadfastly denies that any prototypes infringe the registered marks of either plaintiff. Therefore, there is a genuine issue of fact. The issue is material because it is one element of the confusion of goods cause of action.

(f) Is there a likelihood of confusion?

It isn't enough that the defendant used the plaintiffs' trade-mark or a confusingly similar mark for the advertising or offering for sale of goods or services; the use of the mark must create a "likelihood of confusion" as to the goods or the source of the goods or services before there is a violation of the Lanham Act; e. g., with regard to the alleged infringement due to the yellow pages listing, even if the listing is "advertising", the Lanham Act is violated only if this advertising created a likelihood of confusion as to goods or services or the source of goods or services. Because of the advertising, is it likely that the public will be confused, i. e., will the public believe they are dealing with the plaintiffs? With regard to the "offering for sale" of the defendant's prototypes, did the intended purchasers believe they were dealing with the plaintiffs or is it likely that they might be confused? The factors to be considered in applying the likelihood of confusion test, as enunciated in Chester Barrie, Ltd. v. Chester Laurie, Ltd., 189 F. Supp. 98, 101 (S.D.N.Y.1960):

"Material to a determination of the 'likelihood of confusion' are inter alia: the area of concurrent sale; the ex-

tent to which the goods are related; the extent to which the mark and the alleged infringing name are similar; the 'strength' or novelty of the plaintiff's mark; evidence of bad faith or intention of the defendant in selecting and using the alleged infringing name; and, evidence of actual confusion."

It is evident that the likelihood of confusion issue is one which is particularly ill-adapted to resolution by summary judgment. In Searle v. Pfizer, 231 F.2d 316 (7th Cir. 1956), the Court reversed a summary judgment for the defendant. The Court did not believe the likelihood of confusion issue should be resolved by affidavit. The Court said, at page 318:

"The ultimate determination of consumer confusion is a question of fact . . . 'The ultimate question is always whether or not the public is likely to be deceived; and this is a question of fact, depending on all the attendant circumstances' . . . All doubts as to whether there is a fact issue must be resolved against the moving party."

To the same effect is Avrick v. Rockmont Envelope Co., supra, where the Court said:

"In cases of this kind where no single factor controls the equation, and the court is necessarily required to resolve the question of alleged intent in arriving at its judgment, we are of the opinion that justice can best be served by a trial of the question on its merits."

The defendant has clearly failed to show the absence of a likelihood of confusion, so summary judgment would be improper. The Court must take evidence to determine whether the alleged advertising or alleged offers for sale under the name of Wells Fargo Express Company created a likelihood of confusion.

(g) At the time of the incorporation of the defendant, did the incorporators know of the plaintiffs' use of the trade-mark and did the defendant intend to appropriate it?

The plaintiffs argue that the trademark and its use is common knowledge and the defendant had to know of it. The plaintiffs further rely on the deposition of Eugene Wait (Wait Dep. Tr. pp. 16–18), one of the original incorporators, to show that the existence of both the Bank of California and the historic Wells Fargo & Company was known at the time the defendant took the name Wells Fargo. The defendant argues that the Secretary of State for Nevada was consulted prior to adoption of the name and the incorporators thought the use was proper. There is a genuine factual issue as to whether the defendant intended to appropriate the trademark and good will of the plaintiffs.

The factual issue is material for two reasons: (1) an intentional mala fides appropriation of a trademark raises a presumption that a likelihood of confusion exists; and (2) damages are recoverable only if the appropriation of the trade-mark was intentional.

What was the defendant's motive for selecting the trade-mark? As stated in Callmann, Vol. 3, at page 789:

"A boundless choice of words, phrases and symbols is available to one who wishes a trademark sufficient unto itself to distinguish his product from those of others. Where a defendant selects from this 'practically unlimited field of distinctive names' a trademark entirely unrelated to and disassociated from his business, and the mark chosen is identical to or confusingly similar with the mark publicly associated with the plaintiff's product, then it would appear indisputable that the defendant made the particular choice in order to trade upon the plaintiff's established reputation."

If the defendant intended to appropriate the plaintiffs' trade-mark, there is a presumption that a likelihood of confusion exists and the defendant must disprove the likelihood of confusion. The

rule, as stated by Callmann, Vol. 3, at page 782, is:

"Absence of malicious intent or bad faith furnishes no defense to a trademark infringement action. However, proof of a subjectively fraudulent motive on the part of the defendant aids the court in finding that the intention has borne fruit. Such an intent is father to the presumption that the desired deception will be effected; 'Imitation may supply the place of proof; the plagiarist's motive can only be some advantage to himself, which is most likely to be, in part at any rate, the likelihood that his wares will be taken as first-comer's. It rests with him to disprove this natural inference; until he does we may accept his own estimate of the probabilities.'"

The defendant's state of mind is also material to the issue of remedies, should the case progress that far. Intent is irrelevant with regard to injunctive relief, but generally damages are not recoverable except upon proof of the defendant's wrongful intent. Another factual issue which will become material only if the Court finds that the defendant has infringed or competed unfairly is whether it is likely that the defendant will infringe again. The defendant stated by affidavit that the name "Wells Fargo" will not be used again, but the plaintiffs think an injunction should be issued, since it would not harm the defendant, and could only help them.

(h) Does the use of the name "Wells Fargo" in the defendant's corporate name dilute the value of the plaintiffs' trade-mark?

The defendant argues that its small business has caused no harm to the giant plaintiffs and the trade-mark was already diluted by prior use anyway. The defendant, according to the plaintiffs, has appropriated the trade-mark to trade on the established reputation and good will of the plaintiffs, thus leaving the plaintiffs unable to control their own name. Will the defendant's use dilute the plaintiffs' distinctive trade-mark? This naturally depends on the strength of the plaintiffs' mark and the extent of the defendant's use of that mark. This is a genuine factual issue which is material to the dilution theory of unfair competition.

■ Therefore, the defendant has failed to meet his burden of showing the absence of any genuine issue of material fact and, by admitting certain facts to remove disputed issues, has failed to prove his entitlement to judgment as a matter of law, thereby necessitating the denial of his motion for summary judgment.

## J.

### Personal Jurisdiction of Lichtenstein Defendant

The plaintiffs moved to add the Lichtenstein defendant and to file an amended complaint on July 6, 1971. On November 17, 1971, the motion to add the Lichtenstein defendant was granted. It should be noted that at the time the Lichtenstein defendant was added as a party, the Nevada defendant was no longer owned by the Lichtenstein defendant. On November 2, 1970, Modern Research and its subsidiary, Wilky Research, were purchased by Mr. Jacobs, the present owner of the stock.

The plaintiffs rely on two different theories to attempt to show that the Court has personal jurisdiction over the Lichtenstein defendant. In the motion to add the Lichtenstein defendant, filed July 6, 1971, the plaintiffs relied on an alter ego theory and argued that the Lichtenstein corporation was an alter ego of the Nevada corporation so that personal jurisdiction over the Nevada defendant ipso facto included personal jurisdiction over the Lichtenstein defendant. At the oral argument, June 8, 1972 (Tr. p. 20), the plaintiffs switched from the alter ego theory and argued that the Court had acquired jurisdiction over the Lichtenstein defendant by use of the Nevada long-arm statute. The plaintiffs argued that the Lichtenstein defendant was jurisdictionally present in

the State of Nevada because of its complete ownership of its subsidiary, the Nevada defendant.

■■■■ The Supreme Court spoke adversely to the plaintiffs' contentions in Cannon Mfg. Co v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). The rule of that case and its progeny is that the mere ownership or control by a foreign corporation of the stock of another corporation which is doing business within a state is generally held not to constitute doing business within the state by the foreign parent corporation so as to subject it to the state's jurisdiction for the service of process, where the parent corporation and the subsidiary remain distinct entities.

In Ludwig v. General Binding Corp., 21 F.R.D. 178 (D.C.E.D.Wisc.1957), the plaintiff was seeking personal jurisdiction over a foreign defendant in a factual situation like the instant case. The plaintiff used the alter ego and long-arm statute arguments just as the plaintiffs do in the instant case. The Court rejected the arguments and said:

> "It is a well established legal principle that a foreign, non-resident corporation is not doing business in a state and is not subject to the jurisdiction of a state in which it conducts business through the instrumentality of a subsidiary corporation, where the existence of the subsidiary corporation as a distinct corporate organization is observed. (Numerous citations omitted.) The maintenance of separate books, separate corporate records, separate directors' meetings, etc. are of paramount importance."

The Court then dealt with the issue of whether International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L. Ed. 95 (1945), changed the rule:

> "Cases such as International Shoe Co. v. Washington, supra, which deal with the question of whether a foreign corporation is doing business in a state when it maintains an agent there who performs activities of greater or less extent for the foreign corporation are not relevant in the parent-subsidiary situation because, as explained above, if the separate corporate existence and identity of the subsidiary is maintained, the parent, in contemplation of law, has no agent in the state and is carrying on no activities at all in the state."

The general rule is followed in the Ninth Circuit, Gravely Motor Plow and Cultivator Co. v. H. V. Carter Co., 193 F.2d 158 (9th Cir. 1951), and in Nevada McCulloch Corp. v. O'Donnell, 83 Nev. 396, 433 P.2d 839 (1967). In this case the Supreme Court of Nevada said:

> "The mere fact of stock ownership by one corporation in another does not authorize jurisdiction over the stockholder corporation. To hold otherwise would be to disregard the principles of stockholder immunity and would further lead to the impractical result of holding all stockholders of any corporation responsible in the event of an injury on corporate property."

■■■■ If the plaintiffs in the instant case had proved that the Lichtenstein defendant was an alter ego of the Nevada defendant so that the two would in reality be treated as one, the plaintiffs would not be relying on the long-arm statute for jurisdiction but would acquire jurisdiction over the foreign defendant by having jurisdiction over the Nevada defendant. State v. MacPherson, 62 N.M. 308, 309 P.2d 981 (1957). In the instant case, the plaintiffs have not shown that the Lichtenstein defendant and the Nevada defendant are in fact one entity under the alter ego theory. In fact, at the time the Lichtenstein defendant was added as a party on November 17, 1971, the Nevada defendant was no longer a wholly owned subsidiary of the Lichtenstein defendant. The Nevada defendant had not been owned by the Lichtenstein defendant for over one year. The Nevada defendant and the Lichtenstein defendant certainly were not "one".

■ Furthermore, should the plaintiffs be able to prove that the Nevada defendant and the Lichtenstein defendant were the same under the alter ego theory and thereby acquire personal jurisdiction, the Court should still refuse jurisdiction under the doctrine of forum non conveniens. Vanity Fair Mills Inc. v. T. Eaton Co., Inc., supra.

■ Therefore, since the complete ownership of the Nevada defendant by the Lichtenstein defendant is an insufficient minimum contact to confer personal jurisdiction over the Lichtenstein defendant under the Nevada long-arm statute, and since the two defendants are not "one" under the alter ego theory, and since the doctrine of forum non conveniens would be invoked anyway, the order of November 17, 1971, adding the Lichtenstein defendant as a party was improvidently granted and the Lichtenstein defendant should be dismissed.

In conclusion it is clear that the fact situation in this case is unique; it is a most unusual suit. The defendant argues repetitiously that it has never sold a product, never offered a service, it was dormant for years and it has never made a profit. But the plaintiffs respond that regardless of all that, the defendant took "our name" and has continuously fought to keep it. The case doesn't seem to fit neatly into any of the general theories of trade-mark infringement or unfair competition. A quotation from an old California case seems appropriate, Academy of Motion Picture Arts, etc. v. Benson, 15 Cal.2d 685, 104 P.2d 650 (S.Ct.Cal.1940):

> "The case before us may be novel, but it does not follow that the plaintiff may not be entitled to some relief. In calling attention to the novelty of the facts in American Philatelic Society v. Claibourne, 3 Cal.2d 689, 46 P.2d 135, 140, this court said: 'It is also to be borne in mind that the rules of unfair competition are based, not alone upon the protection of a property right existing in the complainants, but also upon the right of the public to protection from fraud and deceit. * * * It may be granted that this case is a novel one * * * but the fact that a scheme is original in its conception is not a good argument against its circumvention. * * * When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, an equity court must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.'"